[No. 15584. Department Two. May 12, 1920.]

PEARL JONES, *Respondent,* v. JOHN J. ELLIOTT *et al.,* *Appellants.*[1]

FRAUD (7, 22)—ACTION—DAMAGES—RELIANCE UPON REPRESENTATIONS—EVIDENCE—SUFFICIENCY. The evidence sustains a verdict for damages from misrepresentations in the trade of lands for a second mortgage, secured upon land of little value, where the character of the land and the responsibility of the makers and indorsers of the note was misrepresented and the plaintiff was persuaded not to inspect the land; and the mere fact that plaintiff made inquiry from other sources does not preclude relief, if the information gained failed to disclose the fraud.

SAME (23-26)—ACTION FOR DAMARES—MEASURE—INSTRUCTIONS. In an action for fraud in misrepresenting the value of lands traded, it is competent to show the value of the plaintiff's land, in order to show damages and, to submit that issue, notwithstanding the measure of damages is the difference between the value of the property received by plaintiff and its value if it had been as represented.

TRIAL (103)—INSTRUCTIONS—REQUESTS. It is not error to refuse requested instructions in the language proposed, if the substance was given by the court in its own language.

Appeal from a judgment of the superior court for King county, Hall, J., entered March 22, 1919, upon the verdict of a jury rendered in favor of the plaintiff, in an action for fraud. Affirmed.

*McClure & McClure* (*Walter S. Osborn,* of counsel), for appellants.

*Poe & Falknor,* for respondent.

[1]Reported in 189 Pac. 1007.

FULLERTON, J.—In this action the respondent, Pearl Parkhurst Jones, recovered against the appellants, Elliott, Collyer-Vilas-Elliott Incorporated, Alfred E. Hart and Katherine S. Hart, in damages for false representation made in an exchange of properties between the respondent and the appellants Hart. The action was tried by the court sitting with a jury, and the appeal is from the judgment entered upon the jury's verdict.

The undisputed facts giving rise to the controversy are, in substance, these:

Some time in the early part of the year 1915, the appellants Hart became the owners of a promissory note secured by a second mortgage on a tract of land containing 19.83 acres, situated in the Methow valley, in Okanogan county. The note and mortgage were executed on July 15, 1914, by one Robert A. Campbell, Nellie E. Campbell, his wife, and one Susan S. Shaw, to the Zener-Hilt Company, by which company the note was indorsed to the Harts. The note was of the face value of $2,560, matured three years after its date, and provided for annual installments of interest. In April, 1915, the appellants Hart placed the note in the hands of the appellant corporation, a real estate firm, for sale or exchange. On April 25, 1915, the real estate firm caused to be inserted in a morning paper published in the city of Seattle, the following advertisement:

"Wanted: Real Estate. Wanted a bungalow with title or mortgage, nicely situated, for which we will turn in one or two first class second mortgages, where the security is more than twice the combined first and second mortgages. Would like to get action on this immediately. Collyer-Vilas-Elliott Inc."

The respondent at that time owned certain lots in the city of Seattle on which she had constructed a

dwelling house, which she was desirous of selling. This fact was known to one R. J. Huston, and he, seeing the advertisement, called the respondent's attention to it. A few days later, Mr. Huston and the respondent went to the offices of the real estate firm, where they met the appellant Elliott, who was a member of the firm. They made inquiry of him concerning the mortgaged property, its condition and value, and inquiries concerning the financial responsibility of the makers and the indorser of the note. Mr. Elliott made certain representations concerning the matters of which inquiry was made, and the respondent made known to him the property she desired to sell. Further negotiations were had which terminated in an exchange of the respondent's property for the note and mortgage. The land which the mortgage covered afterwards proved to be of no greater value than the first mortgage which was upon it and was sold in satisfaction of that mortgage. The makers and the indorser of the note also proved financially irresponsible, and the result was that the respondent realized nothing for the property she received, although the property which she exchanged for the note equalled substantially the value put upon it in the exchange.

The respondent recovered on the theory that the representations made to her on behalf of the appellants concerning the character and condition of the mortgaged property and the financial responsibility of the makers and the indorser of the note were false and fraudulent, and that she made the exchange in reliance upon such representations. It is over these questions that the controversy between the parties hinges, the appellants contending that there is not sufficient evidence in the record to support the findings of the jury thereon.

Concerning these matters, the respondent testified that, at the first meeting with Mr. Elliott, he made the following representations:

"He told us it was a mortgage on a twenty-acre tract up near Twisp, Washington; that this tract was good land; that it was planted to five-year-old trees; that they were almost ready to bear, and that the indorsers of this note, Zener-Hilt Company, was a company in Wenatchee, a corporation doing a prosperous business; that they are worth between forty and fifty thousand dollars; that Mr. Robert A. Campbell on the note had taken it over—had taken this place that this mortgage was on in exchange for a place that he owned in Wenatchee; that it was a good place—a good orchard, and that Mr. Campbell was an orchardist, and was up there living on this place and that Miss Shaw, another indorser on the note and mortgage, was a school teacher back in Fullerton, Nebraska; that she had other property besides being interested with Mr. and Mrs. Campbell in this; that she was making a good salary; that Mr. Campbell was a perfectly reliable man—he had a wealthy father who was backing him in this, and the Dr. Zener of this Zener-Hilt Company was worth fifty or sixty thousand dollars. He told us that this tract was worth between seven and ten thousand dollars, and that there was a perfectly good and ample water right on the place."

Concerning a second meeting with him, she testified:

"I had been thinking a good deal about the deal and I felt that I should go up and see the property and I went back to Mr. Elliott's office, hoping that he would encourage me to go and see it. He told me that there was absolutely no question about the backers of that note; I don't need to worry a bit about them, and that I would never get the land; that I didn't need to go and look at it, I wouldn't know whether it was a good orchard if I did go and look at it, and that people often made deals where they didn't go to look at the land; that the Harts had made a much bigger deal than mine when they took over these mortgages, and that they had relied on his word."

"I absolutely believed these representations made by Mr. Elliott, for I had known Mr. Elliott for ten or twelve years, and considered him one of the finest young men in Seattle. I certainly would not have made this exchange, except for the representations made to me by Mr. Elliott.

"He told me again and again that there was absolutely no question about the backers of this note. That this corporation; that Dr. Zener himself was worth from fifty to sixty thousand dollars, and that Mr. Campbell was backed by a rich father, and that Mr. Campbell was able to pay, and that Mr. Campbell had traded a good property for it; he had traded a mortgaged property for it, but he didn't tell me that. He didn't tell me that he didn't know Mr. Campbell. He didn't say that he was familiar personally with the affairs of the Zener-Hilt Company, but he did say that it was a wealthy corporation, doing a flourishing business and worth from forty to fifty thousand dollars. I did not know that what Mr. Elliott said to me in regard to these people was based upon information that he had from others. It came as straight facts from John Elliott; he didn't say that somebody else said so; he said those things and made those statements to me. I didn't know that he had not seen the land."

Mr. Huston testified to the representations of Mr. Elliott as follows:

"He told us that it was a twenty-acre tract planted to trees; that the trees were five years old, in a first-class condition, with ample water right; that it was in the Methow valley, and that the soil was first-class soil, volcanic ash soil. He said that the value of the land was from seven to ten thousand dollars, but subsequently in his written statement, his estimate was from seven to eight thousand dollars, but his talk was from seven to ten thousand dollars until that written statement was made. He told us about the responsibility of the makers and indorsers of the note; that was a very strong point with him. He said that the makers, Mr. Campbell and his wife, were perfectly

good; that Mr. Campbell was an expert orchardist; that he had traded his home for this place in Wenatchee, calculating to make this place his home; that he himself was perfectly good, and that the other maker of the note, Miss Shaw, was a school teacher, was drawing a good salary, and amply able to meet her share of it, and that Mr. Campbell also had backing, his father, he said, was perfectly good, and that there never would be any question about the payment of that mortgage. He said the Zener-Hilt Company was a rich concern over there worth forty or fifty thousand dollars. I said to him then, 'Your best plan will be, so that we will know what we are doing, for you to make out a written statement as to what you are willing to do with her, make out a written statement as to the exchange you are willing to make.'

''There never was any representation by Mr. Elliott that he was getting any of his information second hand. He represented these facts as coming from himself, as everything being first-class. He didn't say that Dr. Zener or any other person said anything about this property in describing the character of the land, or the trees, or the water right, or anything else. It came directly from Mr. Elliott as information belonging to and within his own mind. He never said anything to us in any of these conversations that he had never been over in eastern Washington and had never seen this land.''

The writing he handed them in response to Mr. Huston's suggestion was, in part, as follows:

''Note No. 1 for $2,560, as per enclosed copy is dated July 15th, 1914, payable July, 1917, made and executed by Robert E. Campbell, Nellie A. Campbell, his wife, who are now living on the farm, and Susan S. Shaw, spinster, a school teacher of Fullerton, Neb. This note is secured by a mortgage, which mortgage is of record in the county of Okanogan, state of Washington, pages 10 and 11, book U of the records of said county, and covers 19.83 acres in five year old trees, with house, barn and other improvements, which tract of ground is located two miles from the town of Twisp,

and more particularly described as follows, to wit: This mortgage is second to a mortgage of $1,600 owned by the Oregon Mortgage Company of Portland, Oregon, due in 1919, or 2½ years after the second mortgage above referred to is due. This property transferred on a basis of $10,000, but is probably worth $7,000 to $8,000.''

The value of the land lay in the fact that it was suitable for growing an orchard and that it had upon it at the time a flourishing orchard. There was abundant evidence in the record from which the jury could find that the land was unsuitable for orchard purposes; that all of it, save about four acres, was gravelly, covered in part with boulders, and incapable of growing fruit trees of any sort; and that the major portion of the orchard trees that had been originally set out on the tract had died, and that the remainder were stunted and of but little value. There was evidence, also, that the makers of the note owned nothing except this property, and that the indorser of the note was insolvent. There was evidence, it is true, contradictory of this testimony, and Mr. Elliott, particularly, testified that he made no representation as of his own knowledge concerning the matters; that he distinctly told the respondent that he knew nothing of these matters personally, but was merely reciting the conditions as they had been represented to him. He testified, also, that he advised the respondent to make an investigation for herself and not rely upon anything he had said.

But there was here, nevertheless, substantial evidence sufficient to sustain the verdict, and this is as far as we are permitted to inquire. It is not our province to interfere with the verdict of the jury, even though we might find, were we the triers of the facts, that the preponderance of the evidence was with the appellants.

The respondent, prior to consenting to the exchange, made inquiries from other parties concerning the value of the land, and from this fact the appellants argue that she cannot now be heard to say that she relied in making the exchange upon their representations. But this fact is not conclusive of the question. While the information she received was not as favorable as the representations she testified the appellants made, still it was not of such a nature that the court can say, as matter of law, she should have mistrusted the truth of the appellants' representations. The inquiries, moreover, related to the value of the land; she made no inquiry concerning the financial responsibility of the persons obligated on the note.

It is not the rule that inquiry from other sources alone will preclude reliance on the representations of the vendor. To work such an end, the information gained must have been such as to lead a reasonably prudent person to believe that the vendor's representations were false. As we said in *Eyers v. Burbank Co.*, 97 Wash. 220, 166 Pac. 656:

"It matters not, it has been well declared, that a person misled may be said in some loose sense to have been negligent, for it is not just that a man who has deceived another shall be permitted to say to him, 'You ought not to have believed or trusted me,' or 'You were yourself guilty of negligence.' This indeed appears to be true, even of cases in which the injured party had in fact made a partial examination. That is the effect of the decisions, also, in *Wooddy v. Benton Water Co.*, 54 Wash. 124, 102 Pac. 1054, 132 Am. St. 1102; *Strand v. Griffith*, 97 Fed. 854; *George v. Kurdy*, 92 Wash. 277, 158 Pac. 965; and *Miller v. Gerry*, 81 Wash. 217, 142 Pac. 668."

So in 12 R. C. L. 357, 358, it is said:

"But the mere fact that one makes an independent investigation or examination, or consults with others,

does not necessarily show that he relied on his own judgment, or on the information so gained, rather than on the representations of the other party, nor does it give rise to a presumption of law to that effect. If under the circumstances he was unable to learn the truth from such examination or investigation or without fault on his part did not learn it, and in fact relied on the representations, then he is entitled to relief.''

The court, in its charge to the jury, when stating the issues, used the following language:

''The plaintiff charges that the Hillman addition property [the property given in exchange for the note] was at the time worth the sum of $3,500, subject to an outstanding mortgage of $950, and an assessment of something less than $200, the amount of which is specified in the complaint.''

The appellants complain of this statement because, as it is contended, it suggests a false issue to the jury. It is argued that the measure of damages is the difference between the actual value of the note received in exchange for her property and its value had it been as represented, and hence it was of no concern to the jury what value the respondent may have given for the note. But we think the criticism unfounded. The court elsewhere gave to the jury the correct instructions for measuring the damages, and elsewhere correctly charged them, also, that the issue to be determined by them was

''whether there was practiced upon the plaintiff such fraud as is charged in the complaint, and whether, if so, the plaintiff has sustained any financial loss in consequence,''

thereof. Since the gravamen of the action is damages, it is manifest that there could be no recovery unless the respondent had suffered damages, and it is equally manifest that she could have suffered no damages unless she gave value for the note. Hence, on this branch

of the case, it was competent, if not necessary, to show the value of the property the respondent parted with in the exchange, and hence proper to submit to the jury the question whether the property given in exchange had value. The court did no more than this, and we cannot conclude that it committed error in so doing.

The appellants further complain of the refusal of the court to give certain requested instructions. Some of these, if not all of them, could properly have been given in the language in which they were couched. But the court chose to charge the jury, for the greater part, in its own language. In so doing it clearly and distinctly stated the issues and the facts necessary for the jury to find in order to find for the respondent, in as favorable a light to the appellants as the facts warranted. We cannot, therefore, find error on this branch of the case.

Other errors assigned require no special mention.

The judgment is affirmed.

HOLCOMB, C. J., MOUNT, TOLMAN, and BRIDGES, JJ., concur.