[No. 32964. *En Banc.* October 13, 1955.]

ALEXANDER E. HEGGEN *et al.*, *Appellants*, v. THE CITY OF
SEATTLE *et al.*, *Respondents.*[1]

[1]Reported in 288 P. (2d) 830.

*Orvin H. Messegee* and *Howard J. Thompson,* for appellants.

*A. C. Van Soelen* and *C. C. McCullough,* for respondent city of Seattle.

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for respondents Watson.

ROSELLINI, J.—This is an action for personal injuries sustained by the plaintiff Nellie M. Heggen, when the operator of the bus on which she was a paying passenger stopped suddenly to avoid a colision with an automobile that turned in front of him. A few seconds thereafter, the rear of the

bus was struck by another bus. Both busses, owned by the city of Seattle and operated by its agents, were traveling north on Second avenue, in the outside lane of traffic, at the time of the accident, which occurred at the intersection of Second avenue and Marion street.

Alleging various acts of negligence, the plaintiffs sued the city of Seattle and Watson, the driver of the automobile alleged to have made an illegal right turn in front of the bus. By way of affirmative defense, the city maintained that the sudden halting of the first bus was made necessary by the negligence of defendant Watson, and that the operator of the second bus was unable to avoid a collision with the bus in front of him due to a latent defect in the brake pedal, which caused it to break when force was applied to it.

When the verdict was returned in favor of all of the defendants, plaintiffs moved for a new trial, urging that there was no evidence or reasonable inference from the evidence to justify the verdict. They assign error to the denial of their motion.

█ It is the plaintiffs' position that, under the evidence, both defendants could not be absolved unless the jury found one set of facts under which it absolved one defendant and a conflicting set of facts under which it absolved the other defendant. The scope of review in this court of a fact determination by a jury

". . . is limited to the question whether there was substantial evidence to sustain the verdict; we cannot weigh the evidence, nor will a judgment be reversed even if the verdict is against the weight of the evidence where there is no reversible error in the conduct of the trial. *Jones v. Elliott*, 111 Wash. 138, 189 Pac. 1007; *Skeels v. Davidson*, 18 Wn. (2d) 358, 139 P. (2d) 301, 149 A. L. R. 225." *Sevener v. Northwest Tractor & Equipment Corp.*, 41 Wn. (2d) 1, 247 P. (2d) 237 (1952).

█ In the case of *Nawrocki v. Cole,* 41 Wn. (2d) 474, 249 P. (2d) 969 (1952), the well-known rule is stated that the evidence must be examined from a view most favorable to the respondent, and all reasonable inferences must be

granted respondent before this court will reverse a fact determination of a jury. One of the obvious reasons for this rule, which is often cited, is found in *In re Mickelson's Estate*, 41 Wn. (2d) 97, 247 P. (2d) 540 (1952), at p. 100:

"The demeanor of a witness cannot be shown in a written record. It is a matter for the trier of the facts to consider in weighing testimony, and is peculiarly within the province of the trial court."

Upon a review of the evidence, we find that defendant Watson admitted that he was driving in the vicinity of Second and Marion at the approximate time of the accident, but stated he did not recall driving up Second avenue or making a right turn off that street. He testified that he drove up First avenue and made a right turn off First onto Marion street; that he had no recollection of the collision between the two busses; and that he was first notified about the accident approximately a week after it occurred. Watson's testimony was confirmed by his wife.

The driver of the bus on which plaintiff was riding testified that a dark blue 1947 or 1948 De Soto, he believed, suddenly made a right turn in front of him, making it necessary for him to come to a sudden stop. His bus (which we will refer to as bus No. 1) was struck almost immediately by the bus behind him (which we will refer to as bus No. 2). The impact threw him forward over the steering wheel, and while in that position he glanced through the glass door of the bus and saw what he thought to be the car that had turned in front of him proceeding slowly up the hill on Marion street. He copied the license number of the car, which proved to be the vehicle owned by defendant Watson. When asked why he wrote down the license number of the car, he stated that a fellow employee, the operator of the bus behind him, was in trouble and "I figured I should help him out."

A passenger in bus No. 1 testified that he observed a dark car passing in front of the bus immediately after the sudden halt and noticed at that time that the light was green on Second avenue.

According to the plaintiffs' view of the reasonable infer-

ences to be drawn from this evidence, the defendant Watson could be absolved only if both the operator of bus No. 1 and his disinterested passenger were mistaken in their testimony that the light was green when the bus entered the intersection; or, if these witnesses were correct and the light was green on Second avenue, either defendant Watson turned to the right in front of the bus, or, if he was coming up Marion street rather than Second avenue, he crossed the intersection against the red light.

 But this assumes that the jury was compelled to find that Watson was the driver of the car alleged to have turned in front of bus No. 1. The operator of the bus never positively identified the automobile, as he admitted that he did not keep it in view after it turned in front of him, but a few moments later he looked up the hill and saw a car of similar description. The jury was entitled to consider this hiatus in his testimony, in conjunction with Watson's statement that he had turned to the right off First avenue rather than Second avenue, and to conclude therefrom that Watson was not in fact the guilty driver. It was further entitled to believe that at the time Watson crossed Second avenue on Marion street, the green light was with him, as he asserted during the course of his examination.

At the same time, the jury was apprised of the official report made at the time of the accident by the operator of bus No. 1, wherein he stated that the driver of the car commenced to turn one hundred feet from the intersection when he was alongside the left rear of the bus. The jury was informed that, for those traveling northward on Second avenue between Columbia and Marion, there were two traffic lanes. It was further informed, by the testimony of the operator of bus No. 1, that the car following him was traveling in the inside lane of traffic, while the bus was in the outside lane. It could have appeared improbable to the jury that a driver of a car, beginning to make a right turn at the left rear of a bus, could have completed the turn in front of the bus at the intersection without a collision. From this, the jury could have inferred that the bus operator's ob-

servation of the way the accident happened and the identity of the car were not accurate, but, at the same time, could have believed that he was forced to stop when some unidentified car turned in front of him. There was evidence on which the jury could have exonerated defendant Watson and the operator of bus No. 1 without necessarily making conflicting findings.

Plaintiffs assign as error the failure of the court to give their requested instruction No. 6, to the effect that plaintiffs need not prove each and every act of negligence alleged in their complaint, but that it would be sufficient if any one of such acts, or any combination of such acts, of negligence was established, provided that the negligence was the proximate cause of the injury.

The complaint alleged several acts of negligence on the part of the defendants, and the trial court instructed that the burden was upon the plaintiffs to prove the material allegations of their complaint and to prove negligence in the manner charged.

An examination of the instructions as a whole reveals that the jury was informed that it could return a verdict for the plaintiffs on some one, or more, of the acts of negligence without the necessity of finding the defendants guilty of all of them; therefore, the jury was not misled. As we have indicated in *Masterson v. Leonard*, 116 Wash. 551, 200 Pac. 320 (1921); and *Ogilvie v. Hong*, 175 Wash. 209, 27 P. (2d) 141 (1933), when specific acts of negligence are alleged, the plaintiff should request separate instructions on the various acts of negligence which find support in the evidence. When he fails to make such a request, he cannot complain if the instructions presenting his theory of the case are not as comprehensive as those requested by, and given for, the defendant.

Error is assigned to the giving of instruction No. 21, wherein the jury was told to render a verdict for defendant if it found that the injuries of the plaintiff were due, not to the negligence of either of the defendants,

 ". . . but to some latent defect in one of the buses

which was *not discoverable by the exercise of reasonable care* on the part of defendant city."

■ It is contended that this instruction is misleading and inconsistent with instruction No. 13, in which the jury was told that the defendant city must exercise the highest degree of care that is reasonably consistent with the practical operation of its bus; that, in the exercise of that care, a failure to discover a latent defect would not be negligence, provided that defendant used the best precautions that were in common, practical use in the same business and had proved to be effective in discovering defects. We agree that this is the standard to which public carriers are held.

The evidence discloses that bus No. 2 had been driven for five years and had traveled 219,000 miles. The brakes were never inspected visually for any defects; the method used to test them was to apply foot pressure to the brake pedal to see if the brakes would hold. The defendant city called only one expert witness, who testified, concerning the broken brake pedal, that "one could conclude in looking just at this break visually that the casting is of poor quality at the point of breakage." He further testified that there were "no signs of defects" and that "it appeared to be a normal casting to the naked eye." On cross-examination, he testified:

"Q. Now in this metal fatigue, as you call it, isn't it true that often times a visible, slightly visible crack develops so that a portion of the width of this doesn't have any strength, you might say? There's no cohesion at all? A. Well, it is—I will have to qualify that to some extent in that the crack could develop anywhere. *It might be visible. It might not.* It could develop inwardly and develop from the defect inside and work progressively outward. That would tend to be the— Q. (interrupting) But it would tend to develop at the point of this defect that has developed from the poor foundry practice, wouldn't it? A. Yes. Fatigue does develop from the original defect, yes. Q. Now in your examination, your microscopic examination of this, as well as your visual examination, does it not appear to you that the lack of porosity here extends through the thickness of the pedal? A. Yes. I—Q. (interrupting) Doesn't it also appear to you that actually there is dirt, some other element other

than metal in this place where it is severed? A. Well, the answer to both those questions is yes. The dirt may have been an inclusion that caused the defect originally. Q. Yes. Wouldn't you conclude from that observation, though, that the likelihood in this particular pedal and in this break is that it had, after these 219,000 miles of travel and of use, developed some sort of a crack at least across part of its width? A. A visible crack? Q. Yes. A. *No, I couldn't conclude that. It would be indeterminable as to where the crack would appear.* The fact that we have porosity to the surface does not necessarily mean that we would have a crack at the surface. Q. But the defective union here in the metal, itself, goes through the entire thickness of the metal, doesn't it? A. It does part way across. It appears to, yes." (Italics ours.)

■ Under the law as it exists in this state, a carrier in the maintenance and operation of its vehicles is required to exercise the highest degree of care consistent with the practical operation of its business, and in the exercise of such care is required to inspect its equipment for defects. *Walters v. Seattle, Renton & Southern R. Co.*, 48 Wash. 233, 93 Pac. 419 (1908). To neglect this duty would render the carrier liable to passengers who are injured by reason of any defects which might have been discovered by such inspection. The duty imposed upon a common carrier to discover latent defects is set forth in 13 C. J. S. 1388, § 737:

"While it has been held that a carrier is liable for injuries sustained by passengers in consequence of accidents resulting from defects in its machinery, notwithstanding the defects were latent and could not have been discovered by the carrier's ordinary inspection, if the manufacturer could have ascertained them by application of a reasonable test, there is authority to the contrary, and it may be stated as a general rule, as laid down in Corpus Juris, quoted and cited with approval, that the duty of the carrier as to furnishing machinery and appliances originally safe, suitable, and adequate is discharged by a purchase thereof from a competent and reputable manufacturer and an inspection to detect defects discoverable to any tests which the highest degree of care and prudence can suggest, and hence it will not be liable for injuries resulting from hidden defects which could not be discovered and provided against in the exercise of such care and prudence. However, while a mere

lack of knowledge of a latent defect will not excuse a carrier who has not exercised the proper degree of care to discover such defects, a carrier is not liable for latent defects which could not be discovered by the most careful and thorough examination, and certainly is not liable for latent defects of such a character that no degree of skill, care, and foresight could detect their existence."

In one of the general instructions, not expressly limited to the driver of the automobile, the jury was told that " 'negligence' is the failure to exercise reasonable and ordinary care." Instruction No. 21, wherein the term "reasonable care" was used, could have given the jury the impression that only ordinary care was required.

The city's expert witness admitted that the crack in the brake pedal "might be visible" and "it might not," and the evidence established the fact that the brake pedal was never visually inspected. Since the burden was upon the defendant city to establish its affirmative defense of latent defect, it was incumbent upon the defendant to prove to the satisfaction of the jury that the defect could not have been discovered upon inspection or that inspection is impracticable and not in common use among carriers. A material and pivotal point in the case was, did the defendant in inspecting the brake pedal by applying foot pressure to see if the brake would hold the bus, exercise the highest degree of care, or was it also required to visually inspect the brake pedal to ascertain if there were any defects. Applying the lower standard of care, the jury could have found that a visual inspection was unnecessary, whereas, in the exercise of the highest degree of care, such an inspection would be required. It is impossible to know which standard of care the jury applied.

We held in the case of *Firemen's Fund Ins. Co. v. Oregon-Washington R. & Nav. Co.*, 96 Wash. 113, 164 Pac. 765 (1917), that it was reversible error for the trial court in some portions of its instructions to the jury to correctly define the defendant's duty, but in other portions to impose a different and erroneous standard of care. In one instruction the jury was told that the defendant was required to exercise reason-

able and ordinary care, and, in another instruction, that the defendant must exercise the highest degree of care consistent with the practical operation of its business. At p. 122, we said:

"The instructions are irreconcilable and set up for the guidance of the jury contradictory rules pertinent to a material and vital issue in the case. Under such circumstances, it is impossible for the court to say which instruction the jury followed. One of the instructions was erroneous, and it may be the jury followed that one. The instructions being thus inconsistent and contradictory upon a material and pivotal point in the case, the error must be regarded as prejudicial, requiring a reversal."

Substantially the same defect appears in the instruction complained of here, and the giving of instruction No. 21 was therefore error.

Error is assigned to the giving of instruction No. 15, in which the court advised the jury that, as a matter of law:

"If you find from a fair preponderance of the evidence that the operator of defendant city's bus, through no negligence on his part, was compelled to stop or slow down said bus suddenly to avoid collision with another vehicle, then you are instructed that the defendant city's operator was not guilty of negligence."

In examining the cases, we have found that this instruction was given in *Wilcoxen v. Seattle*, 32 Wn. (2d) 734, 203 P. (2d) 658 (1949), and *Nopson v. Seattle*, 33 Wn. (2d) 772, 207 P. (2d) 674 (1949); however, no error was assigned to it. In each of these cases, there was but one bus operator, while in the instant case there were two city busses and two operators involved. The instruction refers to one operator; however, there is no indication therein as to which operator the jury should apply it, and no way of knowing how the jury did apply it. If the instruction were applied to the first operator, who did stop, it would not be erroneous; but if it were applied to the second operator, who was compelled to stop to avoid a collision, but, who did not stop, although he made an attempt which failed, it would be erroneous. Instruction No. 15 should designate the specific

bus operator to which it applies if there is evidence to warrant the giving of it in the retrial of this case.

For the reasons herein set forth, the judgment entered upon the verdict of the jury in regard to defendant Watson is affirmed; and in regard to the city of Seattle, it is reversed and the cause remanded, with instructions to grant a new trial.

SCHWELLENBACH, FINLEY, WEAVER, and OTT, JJ., concur.

HILL, J. (dissenting in part)—To me, instruction No. 15, which reads:

"If you find from a fair preponderance of the evidence that the operator of defendant city's bus, through no negligence on his part, was compelled to stop or slow down said bus suddenly to avoid collision with another vehicle, then you are instructed that the defendant city's operator was not guilty of negligence";

was clearly applicable only to the operator of the first bus. It does not relate to busses, but to a bus and "another vehicle." By instruction No. 7, the jury had already been adequately and properly instructed as to the law governing any vehicle which follows another, and as to the duties of the driver of the second bus.

Instructions Nos. 14 and 16 were applicable to the situation created by the vehicle, allegedly belonging to defendants Watson and wife, which crossed in front of bus No. 1. Instruction No. 15, coming between them, when read in context was clearly intended to refer to the same situation, and not to the following bus. Only if instruction No. 15 is isolated from the instructions which immediately precede and follow it, can it be made the target of justifiable criticism.

I agree with the majority that the standard of care applicable to the city of Seattle should be the same with reference to its maintenance and inspection service as in the operation of its busses, i.e., the highest degree of care reasonably consistent with the practical operation of its business as a public carrier. The error complained of in instruction No. 21, however, was not prejudicial, because

there was no evidence of negligence to take the case to the jury. The evidence was that the latent defect which caused the brake pedal to break was discoverable only by laboratory examination. The basis of the majority opinion is a statement by an expert witness on cross-examination, who conceded the possibility that there may have been a crack in the pedal before it broke, and that such a crack, if it existed, would have been visible. The argument, then, is that by a proper visual inspection the city could have discovered the crack, although in all probability it was not there.

The judgment should be affirmed in its entirety.

HAMLEY, C. J., MALLERY, and DONWORTH, JJ., concur with HILL, J.

