[No. 8585–9–I.   Division One.   August 24, 1981.]

LOIS HANSON RATHVON, *as Personal Representative, Plaintiff,* v. COLUMBIA PACIFIC AIRLINES, *Appellant,* BEECH AIRCRAFT CORPORATION, ET AL, *Respondents.*

*Charles Nomellini, Armistead Rood, Lawrence De Coster,* and *Fred J. Meier,* for appellant.

*Richard Coyle, Richard F. Krutch, F. Lee Campbell, Christopher Young, Jan Peterson, Clifford C. Benson, W. Ronald Groshong, Lucas Powe, John G. Schultz, Albert Lirhus, Dennis LaPorte,* and *W. Wesselhoeft,* for respondents.

DURHAM, J.—Columbia Pacific Airlines, Inc. (CPA) appeals a summary judgment of liability and two damage awards in these consolidated actions for damages for wrongful death arising from an aircraft accident.

On February 10, 1978, a commuter airplane crashed shortly after takeoff from Richland, Washington, killing all 15 passengers and 2 crew members aboard. The aircraft was a Beech 99 operated by CPA and manufactured by respondent Beech Aircraft Corporation (Beech). Eyewitnesses observed that the aircraft made a normal takeoff roll followed by a very steep climb to approximately 400 feet above the runway. The aircraft stalled, then crashed approximately 2,000 feet beyond the end of the runway. A severe fire erupted at ground impact.

The National Transportation Safety Board (NTSB) investigated the crash. Its performance group found that "[t]akeoff with extreme noseup trim" was the "most probable" condition which, together with a center of gravity near the aft limit, as was the case with the accident aircraft, would have caused the flight profile. Another possibility, "noseup runaway trim," was considered "improbable," "although not impossible." The NTSB's systems/structures group examined the accident aircraft's "horizontal stabilizer actuator clutch" and found that four out of the six balls were relatively unworn, or "as new," and were outside the clutch assembly. The two remaining balls were "worn badly," and were "more like slugs in that they were no longer round and were more oval in shape." This condition caused the clutch to slip and become intermittent. Respondent The Talley Corporation (Talley) had manufactured this component.

Sixteen wrongful death actions were brought against CPA and, in some cases, also against Beech, or Beech and Talley. In each action, CPA filed a cross claim or third party complaint against both Beech and Talley for property damage to the airplane hull, and for indemnification and/or contribution should CPA be held liable to plaintiffs. The actions were consolidated for the purpose of plaintiffs' motions for summary judgment against CPA, and for the purpose of this appeal. The only plaintiffs remaining in this appeal, however, are the estates of Per–Arne Fredrik Wilhelm Coster and Sven Olle Nilsson, two deceased passen-

gers.

Summary judgment against CPA was entered on November 16, 1979. Thereafter, plaintiffs obtained a voluntary dismissal without prejudice and without costs as to their claims against Beech and Talley. Beech and Talley then obtained a judgment of dismissal as to CPA's cross claims and third party claims for indemnification and/or contribution. Individual cases on damages were tried before the court, with judgments entered on February 26, and March 19, 1980. CPA assigns error to the damages awarded to the Coster estate ($95,000 economic loss) and the Nilsson estate ($465,500 economic loss and $620,000 general damages).

The primary issue upon appeal is the propriety of the summary judgment. The trial court certified that it considered the three supporting and five opposing affidavits, as well as certain designated pleadings, discovery documents, and memoranda of points and authorities. In general, the supporting affidavits set forth several possible causes of the crash, asserting that every possible cause was CPA's responsibility. Opposing affidavits asserted that negligence and proximate cause remained genuine issues of material fact.

We apologize in advance for the amount of factual detail recited in this opinion. Unfortunately, the crash of modern day aircraft involves considerably more than a notation that the rubber band snapped. That being said, a review of the affidavits submitted by both sides reflects the following:

1. Problems experienced by prior owners. When CPA bought the accident aircraft from another airline in July 1977, it acquired the prior owners' flight log books and maintenance records. Supporting affidavits alleged that these records revealed 32 "write–ups" pertaining to the trim system, "along with the corrective action taken, if any." Counsel quoted eight of these write–ups entered from 1969 to 1976, but not the corrective action, and alleged that they should have alerted Karl Bergstrom, CPA's director of maintenance, to a need for inspection. Douglas Willrich, the

CPA vice–president responsible for inspecting the accident aircraft when it was purchased, testified[1] that Karl Bergstrom and Bob Johnson had reported to him that they had inspected these records and were satisfied with the condition of the airplane. According to their respective testimony, however, neither Bergstrom nor Johnson actually inspected these records, and Bergstrom denied telling Willrich that he had thoroughly reviewed them. Bergstrom testified that he had "glanced through a few of them," but did not closely inspect the records or the aircraft because no one asked him to.

An opposing memorandum asserted that CPA was not required to undertake any "acceptance" inspection, and that the 8 years of "squawks"[2] recorded by prior owners were of historical interest only. Opposing affidavits asserted that CPA had an adequate basis for assuring that the accident aircraft was airworthy when it was purchased, and attached evidence that on May 20, 1977, the aircraft underwent a 100–hour periodic inspection and was issued a Standard Airworthiness Certificate. CPA pilots Rasmussen and Johnson testified that they test–flew the accident aircraft at the time of acceptance.

2. Problems experienced by CPA, in general. Supporting

---

[1]Throughout this opinion, reference to an individual's testimony means that the affidavit quoted from that individual's pretrial deposition.

[2]As CPA explained in response to an interrogatory considered by the trial court: "Squawks are recorded by the pilot in the aircraft daily flight log, and upon conclusion of a flight the flight log is made available to maintenance personnel. Maintenance personnel conduct an inspection of the squawk recorded and make a determination as to whether the squawk must be repaired immediately or whether or not it can be deferred. This inspection and subsequent action is recorded by the preparation of a work order by maintenance personnel which is retained within the maintenance department. Any maintenance work performed to correct squawks noted is recorded on the work order and is in turn transferred to the daily flight log and to the Intermediate Maintenance Work Sheet. If a squawk is deferred, this also is noted on the daily flight log and the Intermediate Maintenance Work Sheet, and the work order is kept open by the maintenance department. At such time as the appropriate corrective action may be taken on any deferred squawks, the appropriate information is entered on the daily flight log, the Intermediate Maintenance Work Sheet and the work order."

affidavits alleged that from July 1977 to February 10, 1978, there were 14 discrepancies concerning the stabilizer trim system entered in the flight logs, 12 of which concerned the trim–in–motion aural system (the out–of–trim warning horn) being either intermittent or inoperative.[3] Bergstrom testified that he knew there had been "several," but not 14, write–ups of the trim–in–motion system.

Opposing affidavits countered that the out–of–trim warning horn is an electrical phenomenon unrelated to the mechanical operation of the trim system, and that most of these discrepancies involved the horn sounding under conditions when it should not be sounding. CPA mechanic Gary Lee testified that the warning horn problem was eventually repaired by installing a new chipboard. The opposing affidavits further alleged that CPA had performed 13 separate "progressive maintenance" inspections, each of which included an inspection of the stabilizer trim system, and attached evidence of all of these inspections as well as of their inspection procedures.

3. Three alleged prior incidents of "intermittent trim." Supporting affidavits alleged that shortly before the accident, CPA pilots experienced three incidents of intermittent trim, only one of which was logged as a "squawk." When Bergstrom was asked if, after three separate reports of intermittent trim, he would have allowed the aircraft to continue carrying passengers while he was investigating the problem, he testified: "No, I don't think so." The alleged incidents are as follows:

(a) January 29, 1978 (logged as a "squawk"): Supporting affidavits alleged that Captain Gary Larson reported that the main trim on the accident aircraft was functioning intermittently on January 29, 1978. Bergstrom testified that he was unaware of this incident until after the accident. He also testified that the corrective action taken,

---

[3]The supporting affidavits alleged that one write–up concerned the trim indicator being inoperative, but that it was later repaired. The subject matter of the 14th discrepancy was unidentified.

readjustment of the trim stop switch, was inappropriate for inoperative trim.

Opposing affidavits countered with the testimonies of the two CPA mechanics, Fred Eaton and Gary Lee, who worked on the Larson "squawk." Eaton testified that the squawk read: "Note. Main trim is intermittent[.] [I]t will stop functioning on one side at least. Should be looked [at]." Eaton testified that he activated the trim system and could not duplicate the problem:

> Now, I did find that the trim–in–motion needle on the pedestal gauge hesitated momentarily when the trim was first activated. I thought possible [*sic*] that the pilot while he was flying if this happened in the air, the gauge hesitating, that he might mistake this for the trim not working.

Eaton signed off by writing: "Possible gauge problem and trim motor not stopping at end of travel," and apparently also: "Please monitor for today [January 30, 1978]." Eaton testified that he also should have written: "Could not duplicate problem," but that he felt he had solved the intermittency problem by operating the system himself and by requesting the pilot to monitor the situation during the next flight.

Lee testified that he troubleshot the squawk in the normal routine, and signed off that he had "[r]eadjusted trim stop switch." He testified that if he could not find the cause of a squawk concerning intermittent trim and the "ground check" was okay, then he could sign off on the squawk and return the aircraft to service. Lee testified:

> I couldn't get the trim to malfunction or anything else. So our standard procedure was "Checked system, System okay." I made a lot of write–ups like this because if I couldn't get it to malfunction, that is the only thing I could do. We had to have some sort of corrective action for every write–up there was in these books.

He also testified that although *inoperative* trim would be a grounding item, *intermittent* trim, the basis for the squawk, was not. The trim was not inoperative, Lee testified, because it worked for him.

(b) <u>Approximately February 6, 1978</u> (unreported): At Bergstrom's deposition, counsel read into the record the following statement of CPA pilot Randy Fogerty:

"One day last week in one of the Beech 99's I had a problem, or I should say my first officer had a problem with trimming the airplane. The first indication was when taking off from Seattle, the first officer indicated that he was having some difficulty in controlling his pitch. I asked if he was having any problem and he indicated he was not. On arrival at Richland, on approach downwind, the first officer asked for approach flaps and I said 30 degrees of flaps. The first officer then asked me to take the aircraft controls and indicated he was having trouble with trim control. I took the controls and applied forward trim to maintain straight and level. I asked him to check his trim and he did so. He indicated that his trim was then functioning properly. We landed without incident. I did not write up the occurrence.

Bergstrom testified that this should have been written up.

Opposing affidavits quoted Fogerty as testifying that the incident occurred in the accident aircraft, and probably on February 6, 1978. Fogerty testified that when he hit the trim switches that day, they worked fine for him. When asked if he had considered the incident to be a malfunction, Fogerty replied:

I considered it something unusual that I hadn't had a problem with. But it was the type of problem where I didn't think anything of it simply because sometimes when switches are turned on, sometimes the first time you turn them on, whatever it is you're trying to turn on doesn't turn on. You flick the switch off, you turn it on again, it works. And that's basically what I thought it was.

(c) <u>February 8, 1978</u> (orally reported): Supporting affidavits alleged that First Officer Casey Burns encountered intermittent trim failure with the main trim during a training flight with Captain Gary Becker on the accident aircraft. They alleged that the incident was reported to CPA mechanic Gary Lee, but that no repairs were. effected. Bergstrom testified that this incident should have been

written up.

Opposing affidavits countered with Gary Lee's testimony that Casey Burns said, "Hey, this thing is malfunctioning a couple of times during flight," but that Captain Becker said, "Well, mine worked." Lee activated the system, and it appeared to work. Burns did a trim test in Lee's presence. Captain Becker and Lee talked it over, and both attributed the problem to Burns' inexperience as a pilot, not the aircraft. CPA mechanic Frank Young also testified that it is possible to inadvertently fail to operate the trim switches on a Beech 99.

Although other factual issues are also debated in the affidavits, they will be discussed elsewhere in this opinion.

## SUMMARY JUDGMENT

Summary judgment can be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The moving party has the initial burden to prove by uncontradicted facts that there is no genuine issue of material fact. *Ohler v. Tacoma Gen. Hosp.*, 92 Wn.2d 507, 598 P.2d 1358 (1979); *Coughlin v. Seattle School Dist. 1*, 27 Wn. App. 888, 621 P.2d 183 (1980). Once the moving party has met its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *Graves v. P.J. Taggares Co.*, 94 Wn.2d 298, 302, 616 P.2d 1223 (1980). All material submitted for and against a summary judgment motion is considered in the light most favorable to the nonmoving party. *Ohler v. Tacoma Gen. Hosp., supra; Deacy v. College Life Ins. Co. of America*, 25 Wn. App. 419, 607 P.2d 1239 (1980). An appellate court must make the same inquiry as the trial court. *Fahn v. Cowlitz County*, 93 Wn.2d 368, 610 P.2d 857 (1980).

Although issues of negligence are ordinarily not susceptible of summary adjudication, nothing precludes a court from deciding such issues as a matter of law. *LaPlante v. State*, 85 Wn.2d 154, 531 P.2d 299 (1975);

*Green v. Burrill,* 26 Wn. App. 774, 614 P.2d 229 (1980). Negligence consists of (1) the existence of a duty owed to the complaining party, (2) a breach thereof, and (3) a resulting injury. *LaPlante v. State, supra.* For legal responsibility to attach to the negligent conduct, the claimed breach of duty must be a proximate cause of the resulting injury. *LaPlante v. State, supra.*

Respondents Coster and Nilsson contend that CPA was properly adjudged negligent as a matter of law under any of the following theories: (1) presumptive liability of a common carrier; (2) negligent operation of the accident aircraft; (3) negligence per se; and (4) failure to discover the defect. We shall address each of these theories in order.

### PRESUMPTIVE LIABILITY OF COMMON CARRIER

█ It is undisputed that CPA was a common carrier. As such, it had the duty to exercise the highest degree of care for the safety of its passengers consistent with the practical operation of its business. *Kaiser v. Suburban Transp. Sys.,* 65 Wn.2d 461, 398 P.2d 14 (1965); *McDonald v. Irby,* 74 Wn.2d 431, 445 P.2d 192 (1968). This duty, however, falls short of making a common carrier an insurer of its passengers' safety. *Kaiser v. Suburban Transp. Sys., supra.* These rules are no different for common carriers of passengers by air. *See* Annot., 31 A.L.R. Fed. 270 (1977); Annot., 73 A.L.R.2d 346 (1960); 8 Am. Jur. 2d *Aviation* §§ 67–68 (1963); L. Kreindler, *Aviation Accident Law* § 3.07, at 3–13 (rev. ed. 1980).

Respondents contend, however, that CPA's breach of duty is established by a rebuttable presumption of negligence against a common carrier in favor of its passengers. They argue that this presumption is to be given the same effect on a motion for summary judgment as at trial. They contend that this presumption can be rebutted only if CPA makes a prima facie showing of an absence of negligence on its part, or proves the existence of a latent defect, and that CPA has done neither.

Two Washington cases are cited as support for respon-

dents' theory of presumptive liability: *Hedges v. Chicago, M., St. P. & Pac. R.R.,* 61 Wn.2d 418, 379 P.2d 199 (1963) and *Kaiser v. Suburban Transp. Sys., supra.* In *Hedges,* the court upheld a jury verdict awarding a railroad passenger damages for personal injuries she suffered from a fall on the train. The plaintiff had been thrown to the floor by a violent jolt when an axle journal broke. The railroad showed that it had complied with industry custom by inspecting the axle only 7 months before; but it offered no exculpatory explanation for the presence of moisture in the axle journal housing which had led to corrosion. The majority opinion[4] of the court held that the railroad had failed to overcome the "presumption of negligence" on its part, saying:

> It is well settled that a common carrier of passengers owes the duty to exercise the highest degree of care consistent with the practical operation of its business; and where injury to a passenger occurs through some conveyance or apparatus of the carrier, in the absence of other showing, it must be assumed to have been due to negligence of its employees imputable to the employer.

*Hedges,* at 419–20.

The two justices specially concurring criticized the *Hedges* majority for attempting to rely upon a specific act of negligence in a res ipsa loquitur case and then misapplying the res ipsa loquitur rule. They characterized the case as res ipsa loquitur raising an inference of negligence, and criticized the use of a "presumption of negligence":

> It is conceded that the cases cited by the majority (all prior to 1932) speak of a "presumption of negligence"; and that a small minority of state courts and some authorities including Prosser (see 37 Cal. L. Rev. 183) take the position that in carrier–passenger cases, the burden should be on the carrier to prove that there was no negligence when a passenger is injured.
>
> My view is that we should continue, with most courts and authorities, to take the position that res ipsa loquitur

---

[4]Sitting as a department, two justices wrote the majority opinion and two justices concurred, but on other grounds.

principles should apply to such cases; or, if we are to abandon them, clearly state that we are doing so and why.

*Hedges,* at 422 n.1.

This one opinion upon which so much of respondents' theory depends has been cited only once, in *Kaiser v. Suburban Transp. Sys., supra.* The plaintiff in *Kaiser* was a bus passenger who was injured when the bus driver lost consciousness and struck a telephone pole. The driver testified that he had become drowsy as a result of a drug for the treatment of a nasal condition, but that his doctor had not warned him of any side effects. The Supreme Court reversed and remanded the directed verdict against the bus company and driver, and the dismissal of the doctor and the doctor's employer. The court refused to apply *Hedges* because the carrier had made a prima facie showing of an absence of negligence, presenting questions of fact for the jury. *Kaiser* has not been subsequently cited on this point.

■ We agree with the general rule that:

> Apart from the doctrine of res ipsa loquitur, negligence will not be presumed or inferred from the mere occurrence of an airplane accident, or from the fact of injury, and this principle is not altered by the fact that the defendant is a common carrier of passengers. The mere fact of a plane accident or of injury to a passenger is not sufficient to raise a presumption that the carrier was negligent.

(Footnotes omitted.) 8 Am. Jur. 2d *Aviation* § 118, at 747–48 (1963).

■ Nor does the doctrine of res ipsa loquitur apply. Res ipsa loquitur is a doctrine allowing the trier of fact to draw an inference that the defendant was negligent when certain circumstances are present.[5] *Miller v. Kennedy,* 91 Wn.2d

---

[5]Those certain circumstances have been described as follows: "Where the agency or instrumentality causing the injury was in the control of the defendant, and the injury is of a type which would not ordinarily result if the defendant were not negligent, a jury may infer from the fact of the injury that the defendant was negligent." *Miller v. Kennedy,* 91 Wn.2d 155, 159–60, 588 P.2d 734 (1978). Some courts hold that res ipsa raises a "presumption" of negligence, while others hold

155, 588 P.2d 734 (1978). The purpose of res ipsa is to allow a case to go to the jury by inferring negligence without proof thereof. *Vogreg v. Shepard Ambulance Serv., Inc.,* 44 Wn.2d 528, 268 P.2d 642 (1954). The trier of fact is not required to draw an inference of negligence, however. *Brauner v. Peterson,* 16 Wn. App. 531, 557 P.2d 359 (1976). The doctrine of res ipsa loquitur, in and of itself, is thus insufficient to support a summary judgment for a plaintiff unless the facts are undisputed. L. Kreindler, *Aviation Accident Law* § 3.09[9] (rev. ed. 1980).

We conclude that CPA was not presumed liable as a matter of law, and that the normal rules of summary judgment are determinative. Even if such a presumption exists, it can only be given effect in the context of a summary judgment "until 'the opposite party adduces prima facie evidence to the contrary.'" *Key v. Cascade Packing, Inc.,* 19 Wn. App. 579, 583, 576 P.2d 929 (1978), quoting from *Bates v. Bowles White & Co.,* 56 Wn.2d 374, 378, 353 P.2d 663 (1960). As will be described below, CPA submitted such prima facie evidence to the contrary.

### NEGLIGENT OPERATION OF ACCIDENT AIRCRAFT

Respondents contend that the defective actuator clutch could not have been the sole proximate cause of the crash because the clutch would not even come into play until the aircraft was already in an excessively nose–high position. They contend that CPA operated the aircraft with an inaccurate trim indicator and an inoperative out–of–trim warning horn; that CPA failed to prevent the aircraft from reaching the excessively nose–high attitude; and that CPA failed to maintain control of the aircraft. They argue that CPA's own affidavits show that even with an out–of–trim takeoff and a defective clutch, "careful attitude awareness"

---

that it raises an "inference" of negligence. *See* Annot., 53 A.L.R. 1494 (1928), supplemented by 167 A.L.R. 658 (1947). It is this confusion in terminology that we believe is the source of the difficulty in *Hedges v. Chicago, M., St. P. & Pac. R.R.,* 61 Wn.2d 418, 379 P.2d 199 (1963).

by a qualified pilot could have prevented the aircraft from getting into a position from which recovery was impossible.

The "careful attitude awareness" argument is based upon the findings and conclusions of the NTSB performance group, expressed in what the parties refer to as the "Burgess report." After the accident, the Burgess group conducted certain test flights, and found, *inter alia:*

> It was found that while sufficient elevator authority exists to prevent rotation to high noseup pitch attitudes, careful attitude awareness must be maintained to restrain the strong pitch up tendency of the Beech 99 after liftoff in such trim/C.G. conditions. . . .

Based upon the results of those test flights, the Burgess group concluded:

a. The Model 99 aircraft is controllable if takeoff flight is attempted with the trim full noseup and with C.G. near or at the aft limit.

b. *The control forces, although high, are manageable and within the limits as specified by Federal Air Regulation 23.143.* . . .

. . .

d. If, through inattention or for some physiological reason, the pilot permits the Beech 99 to rotate to a pitch attitude of 30° or greater and if he then does not promptly correct the aircraft attitude, a stall will occur from which recovery before ground contact is essentially impossible.

These findings and conclusions raise genuine issues of material fact, but do not resolve them. Insofar as we can ascertain from the documents before us, these test flights were conducted under the same or similar trim and center of gravity conditions as the accident aircraft, but without taking into account any effect that the defective actuator clutch may have had upon the pilots' ability to control the aircraft. We are also faced with a record that does not show precisely when the actuator clutch comes into play.[6]

---

[6]An opposing memorandum simply explains that "[i]f the clutch mechanism is allowed to slip at too low of [*sic*] force, normal operation of the stabilizer trim will be interrupted." At our request during oral argument, counsel furnished citations

We conclude that CPA cannot be summarily adjudged liable upon this basis.

## NEGLIGENCE PER SE

Respondents contend that CPA employees violated 14 C.F.R. § 135.57 (1978)[7] by failing to report and repair the malfunctioning trim indicator and inoperative out–of–trim warning horn, and by failing to report the last two incidents of intermittent trim, and that these violations constituted negligence per se. In addition, they contend that if CPA's pilots intentionally flew the accident aircraft in the nose–high manner in which it was flown, then they would not have been exercising the skill and judgment required of them under the federal aviation regulations, 14 C.F.R. Part 135.

We have no difficulty with the concept of holding that violations of the federal aviation regulations, like violations of any other regulations, may constitute negligence per se, under appropriate circumstances. *See Kness v. Truck Trailer Equip. Co.*, 81 Wn.2d 251, 501 P.2d 285 (1972); *Bayne v. Todd Shipyards Corp.*, 88 Wn.2d 917, 568 P.2d 771 (1977); Restatement (Second) of Torts § 286 (1966). *See also* Annot., 31 A.L.R. Fed. 270 (1977). We cannot find, however, that such regulations were violated as a matter of law here.

CPA has admitted that all "malfunctions" must be reported according to federal aviation regulation section 135.57, and that all "mechanical interruptions" must be reported according to federal aviation regulation section 135.59. CPA has not admitted, however, that either it or

to the record where the answer to this question is supposedly found, but we remain unenlightened.

[7]This particular section, 14 C.F.R. § 135.57 (1978), which was apparently in effect at the time of the accident, no longer exists. It required certificate holders to report, *inter alia*, any "failure, malfunction, or defect in a multiengine aircraft that occurs or is detected at any time if, in its opinion, the failure, malfunction or defect has endangered or may endanger the safe operation of the aircraft." 14 C.F.R. § 135.57(c) (1978).

any of its employees violated the federal aviation regulations. There is no evidence to suggest that its pilots intentionally flew the accident aircraft in the nose–high manner in which it was flown, and precious little evidence to suggest that the trim indicator was malfunctioning or that the out–of–trim warning horn was inoperative.[8]

Respondents showed that Karl Bergstrom, CPA's director of maintenance, testified that the last two incidents of intermittent trim should have been written up. This testimony amounts to a legal conclusion on Bergstrom's part. CPA set forth specific facts tending to show that the January 29 incident was properly investigated; that the February 6 pilot did not evaluate his incident as the type of malfunction that should be reported; and that the February 8 incident occurred during a training flight, and that after the mechanic checked the trim system, both the pilot and the mechanic agreed that the incident was due to the trainee's inexperience rather than the aircraft.

We conclude that whether or not CPA or any of its employees violated the federal aviation regulations is a mixed question of fact and law, the facts of which are disputed. As such, the question was incapable of being resolved by summary judgment.

### CPA's Duty To Exercise the Highest Degree of Care

CPA contends that the defective actuator clutch was a latent defect of which it neither knew nor should have known, and that whether or not it breached its duty to exercise the highest degree of care is a genuine issue of material fact. Respondents argue that the defect was patent, not latent, because CPA had adequate notice from the

---

[8]The evidence is inconclusive. The supporting affidavits quoted the testimony of CPA pilot Del Andreini who apparently had devised his own method for setting the takeoff trim which he believed was "more accurate" than the trim indicator. They also quoted the testimony of William B. Weston, who inspected the out–of–trim warning horn after the accident, and found the switch in such a position as to be electrically open at all times, in which case, the horn would not blow.

three prior incidents of intermittent trim. Respondents remind us that Bergstrom testified that had he known of these prior incidents, he would not have let the aircraft fly.

The trial court's decision was based in large part upon the accumulation of notice that CPA supposedly had about problems with the trim system. The court said that although any single item by itself was insufficient to put the carrier on notice that something was wrong, it was clear that

> if all of this knowledge, since the acquisition of the airplane and the time prior thereto, had been *accumulated properly and presented to somebody in authority, the conclusion would have been inescapable that some drastic action would be required.*

We do not believe that this critical issue can be disposed of quite so readily without resort to the benefit of judicial hindsight, albeit well intentioned. CPA's opposing affidavits set forth specific facts tending to show that it had taken appropriate maintenance action with respect to the prior discrepancies as well as the January 29 and February 8 incidents of intermittent trim. CPA also set forth the pilot's explanation for his failing to report the February 6 incident of intermittent trim.

In addition, CPA's opposing affidavits set forth specific facts to raise a latent defect defense. The opposing affidavits alleged that the defective actuator clutch could not have been discovered unless the actuator was completely disassembled, as was done by the NTSB. They alleged that neither CPA nor Bergstrom Aircraft Services were authorized by the federal aviation regulations to disassemble the unit and showed that CPA mechanics Lee and Young testified that they had never disassembled one.[9] The affidavits

---

[9]When the NTSB inspected the actuator clutch, it found evidence of complete disassembly. CPA admitted that examination of the actuator after the crash disclosed, among other things, that both the primary and secondary motors had been replaced; that no safety wire was found on the actuator switch box; that the sealing material found in the lower gear box cover was different than that normally used by the manufacturer; and that the maintenance and service records in its possession did not reveal any entry of such changes.

attached excerpts from the Beech maintenance manual and Talley overhaul manual, alleging that neither revealed any procedures by which CPA could have discovered a defective actuator clutch. The affidavits particularly criticized the Beech maintenance manual for not establishing a specific TBO (time between overhaul) for the actuator, but instead recommending that it be overhauled or replaced "on condition." Karl Goettert testified that there was no way to test the actuator to specifications under load conditions without removing it. The affidavits contended that if Beech had established a specific TBO, then the actuator would not have been left in service and allowed to accumulate undetectable wear to the point where it functioned normally during ground checks but was incapable of operating under certain loads.

Moreover, CPA's opposing affidavits also raised the argument that the trim actuator was defective in design and/or manufacture. Opposing affidavits alleged that Beech and Talley had prior knowledge of the same type of defect found in the trim actuator of the accident aircraft. They attached photocopies of Tally memoranda and a Beech engineering change order, all dated between 1968 and 1970, to support their assertion that ball bearings had escaped from such a clutch mechanism before, and that a design change was effected to correct the problem. However, CPA also submitted the affidavit of Dr. Robert James Waldron, a self–employed aviation safety consultant, who examined the accident aircraft's clutch assembly sometime after July 26, 1979, after the NTSB had disassembled it and then reassembled it in its "as–recovered" condition. Dr. Waldron measured the gap inside the clutch assembly and found it to be approximately twice the .045 inches called for by the Talley specifications. According to his affidavit, "This excessive gap is primarily the result of insufficient shimming or the use of a spacer of less than the required length" and also some wear on the internal parts.

A carrier's failure to discover a latent defect is not negligence if it exercised the highest degree of care reason-

ably consistent with the practical operation of its business, and used the best precautions that were in common, practical use in the same business and had proved to be effective in discovering defects. *Heggen v. Seattle,* 47 Wn.2d 576, 288 P.2d 830 (1955).

We conclude that whether or not CPA failed to exercise the highest degree of care according to the standards expressed above remains a genuine issue of material fact.

In summary, we hold that, for the several reasons detailed above, genuine issues of material fact were presented at the motion for summary judgment. Accordingly, the trial court's order granting summary judgment is reversed.

### Other Issues Pertaining to Respondents Coster and Nilsson

Respondents Coster and Nilsson raise three other issues with respect to the summary judgment that should be briefly addressed. First, they contend that CPA cannot avoid liability to them by raising issues material only between CPA and other concurrent tort–feasors because of the doctrine of joint and several liability. We agree, but find that the factual issues involved in this appeal, *i.e.,* whether or not CPA was negligent, and, if so, if such negligence was a proximate cause of the suffered injuries, are material between CPA and the plaintiff–respondents.

Second, plaintiff–respondents contend that CPA agreed in open court to not appeal the summary judgment when, at a January 25, 1980 hearing, CPA's counsel stated, "Your Honor, we have no intent of appealing the plaintiffs' case." The order granting a summary judgment was not yet appealable at the time this statement was made because no final judgments had been entered. CR 56(c); *Maybury v. Seattle,* 53 Wn.2d 716, 336 P.2d 878 (1959). We have reviewed the hearing transcript, as well as the court clerk's minutes of that date and the rest of the record, and find no evidence of any "agreement" that would be binding upon CPA. *See* RCW 2.44.010(1); *Morgan v. Burks,* 17 Wn. App.

193, 563 P.2d 1260 (1977).

■ Third, plaintiff–respondents contend that if the summary judgment is reversed, then a new trial should be limited to the issue of liability inasmuch as the issue of damages has already been tried. In certain circumstances, a new trial may be had on the issue of liability alone. *Crawford v. Miller,* 18 Wn. App. 151, 566 P.2d 1264 (1977); Annot., 34 A.L.R.2d 988 (1954). In this case, however, we cannot say with any degree of certainty that upon retrial the finder of fact would award the same amounts. Evidence may come to light which would either increase or decrease the damage awards significantly. We conclude that the issues of liability and damages are not completely severable, and that, in fairness to all parties, the damage awards in the Coster and Nilsson cases must be reversed. Accordingly, we do not consider any of the assignments of error pertaining to the damage awards, including the trial court's imposition of prejudgment interest.

OTHER ISSUES PERTAINING TO RESPONDENTS
BEECH AND TALLEY

CPA also assigns error to the trial court's dismissal of its cross claims against Beech and Talley for indemnification and/or contribution, but contends that if the summary judgment is reversed, we need not consider this issue. Beech disagrees, contending that the dismissal of CPA's contribution claim was not dependent upon the summary judgment, but was based upon CR 12(b)(6), failure to state a claim upon which relief can be granted, and should thus be affirmed. Beech has also filed a supplemental memorandum with this court, contending that the new contribution statute enacted in the 1981 legislative session is inapplicable because the trial court had fully disposed of all claims prior to the effective date of the act.[10]

---

[10]Engrossed Senate Bill 3158, 47th Legislature (1981), became effective July 26, 1981. Although the act applies to all claims arising on or after its effective date, the right of contribution section also applies to

all actions in which trial on the underlying action has not taken place prior to

The judgment of dismissal was obtained pursuant to Beech's and Talley's respective motions for summary judgment on CPA's cross claims. The trial court certified that it considered the order granting summary judgment against CPA in rendering its decision on these cross claims. Our reversal of the summary judgment thus requires reversal of the judgment of dismissal insofar as it relates to CPA's cross claims in the Coster and Nilsson cases.

We grant Beech's motion to dismiss CPA's assignment of error pertaining to the costs awarded to Beech and Talley in connection with the judgment of dismissal. Beech and Talley are no longer the prevailing parties in light of our decision. The issue of costs, both in the trial court and on appeal, shall abide the final outcome of the trial.

Finally, Beech has asked this court to reject CPA's late reply brief and impose terms of $1,000. We have not considered any of CPA's arguments that were outside the proper scope of a reply brief, and hereby deny Beech's request for terms inasmuch as no prejudice from the delay has been shown.

The order granting summary judgment is reversed.

RINGOLD, A.C.J., and ANDERSEN, J., concur.

Reconsideration denied October 12, 1981.

Review denied by Supreme Court January 8, 1982.

---

the effective date of this amendatory act, except that there is no right of contribution in favor of or against any party who has, prior to the effective date of this amendatory act, entered into a release, covenant not to sue, covenant not to enforce judgment, or similar agreement with the claimant.
Laws of 1981, ch. 27, § 15(2).