[Civ. No. 16014. First Dist., Div. One. Nov. 12, 1954.]

ETHEL BOYD, Appellant, v. HOWARD R. WHITE et al., Respondents.

Morgan & Beauzay and Lawrence Vold for Appellant.

Crist, Stafford & Peters, Crist, Peters & Donegan and John M. Brenner for Respondents.

PETERS, P. J.—Plaintiff brought this action to recover damages for fright and mental suffering and for injury to her real property caused when an airplane crashed into her home. The plane was piloted by Ernest J. Galindo, named as a defendant. Galindo had a student pilot certificate, and was taking flying lessons from Lenerville, who operated a flying school at the airport in question. Galindo, under Lenerville's supervision, had flown solo prior to the accident here involved. Lenerville, also named as a defendant, owned several planes, but, on the day here involved, when Galindo desired to rent a plane, all of Lenerville's planes were in use. Accordingly, pursuant to a prior oral arrangement with Howard R. White and Fred W. Sautter, partners in the operation at the same airport of the Garden City Aero, and also named as defendants, Lenerville rented a plane from White and Sautter, and, in turn, rented that plane to Galindo. It was that plane, operated by Galindo flying solo, that crashed into plaintiff's home. Galindo, although injured, was not killed. As a defendant he defaulted, although he appeared as a witness at the trial. Motions for a nonsuit and for judgment on the pleadings by Lenerville were denied. A motion for a nonsuit by White and Sautter was granted on the ground that the doctrine of absolute or strict liability, as a matter of law, did not apply to them. Judgment of nonsuit was entered in their favor. From that judgment plaintiff appeals. This appeal involves, therefore, only the problems revolving around the liability of White and Sautter, if any, and does not involve any problems relating to the liability of Galindo or of Lenerville.

This being an appeal from a judgment of nonsuit, all conflicts in the evidence must be resolved in favor of appellant, and every reasonable inference permitted by the evidence must be indulged in her favor. So considered, the facts are as follows:

In the year 1949 respondents operated the Garden City Aero at Reid-Hillview Airport in San Jose. They owned six planes. They rented them to pilots, flew charter and freight, and instructed students in flying. Located at the same airport were several other flying schools, including one

operated by Lenerville. About a year before the accident, which occurred on August 28, 1949, respondents and Lenerville entered into a working arrangement to rent airplanes from each other on those occasions when one needed a plane but had none of his own immediately available. Under this arrangement, if one of the flying schools had a student, but all of its planes were in use, it would rent a plane from the other school to take care of that student. Under the arrangement the asking school paid the other school $5.00 an hour for the plane, and then the asking school rented it to its client for $8.00 or $10 per hour, dependent upon whether solo or dual instruction was involved. This arrangement was entered into because, obviously, it would not be good business for one flying school to send a client to the other school to rent a plane when the first school had none available, because the next time the client might not come back to the first school.

On August 28, 1949, Galindo, then 24 years of age and regularly employed at a local cannery, came to Lenerville, a qualified instructor, to continue his flight instruction. Galindo had taken lessons from Lenerville in 1948, but this instruction had been interrupted for a period of nine months prior to August 28, 1949, because Galindo, during such period, was in the Marines. During those nine months Galindo had done no flying. Galindo had a duly issued "Student Pilot Certificate." During his prior instruction from Lenerville he had qualified to fly solo. His log book shows that he had some 15 solo flights in October of 1948 and three solo flights in November of 1948, November 8th being the date of his last flight before returning to duty with the Marines.

Galindo knew respondent White. Galindo testified that, before starting his flight instruction from Lenerville in October of 1948, on three occasions in June, July or August of 1948 he had discussed with White the possibility of buying a plane from him. Later that same year Galindo had approached the Garden City Aero to secure instruction as a student pilot under the G. I. Bill. The Garden City Aero refused to take Galindo on as a student, partly because it already had all of the students it could handle, and partly because White's partner thought Galindo, for some undisclosed reason, did not have a good character. At any rate, White recommended Lenerville as an instructor, referred Galindo to him, and Lenerville agreed to take on Galindo as a student. It also appears that in November, 1948, just before he went into the Marines, Galindo was accused by

the authorities of "buzzing" a house. Galindo testified that this occurred when he was making a simulated forced landing as part of his instruction. This incident occurred after the Garden City Aero had rejected Galindo as a student, and there is no evidence that White or his partner knew anything about it prior to the accident.

On August 28, 1949, Galindo talked with Lenerville about renewing his flight instruction, and Lenerville agreed to continue with the program. Lenerville had no planes then available. He went to White's office and arranged to rent a plane from him. Apparently Galindo did not accompany Lenerville to White's office, but Galindo was present when Lenerville and White came out of the latter's office and White showed "us" which plane to take. The plane designated was a two-seater dual-operated training plane customarily used for flight instruction. White gave no instructions as to who was to fly the plane or how it was to be operated. He admitted that he understood that the plane was to be flown by someone other than Lenerville. Although White testified that he did not know who was to fly the plane, and Lenerville testified that he did not tell White that a student pilot was to fly the plane, from the evidence above set forth about White's past relationships with Galindo, and about White showing both Lenerville and Galindo what plane to take, it is a reasonable inference that White knew or should have known that Galindo was to fly the plane. Pursuant to the oral arrangement above discussed White charged Lenerville $5.00 for the rental of the plane for one hour, and Lenerville charged Galindo $10, which included the fee for instruction.

Although Galindo had flown solo in the past, because he had not flown for nine months, Lenerville recommended that he fly dual with Galindo as a check to see if Galindo was proficient enough to fly solo. The two flew for about 30 or 40 minutes when Lenerville became satisfied with Galindo's ability to fly solo. The plane was brought to earth and Lenerville got out. Galindo then took the plane up, heading towards Warm Springs Airport, the area between the two airports being considered by instructors and students as a practice area. Galindo testified that, after making a broad turn after the takeoff, he got up about 1,000 feet when the motor started to sputter and he began to lose altitude. It was a cool day and he thought perhaps his carburetor was beginning to ice up so he put on the carburetor heat. This

did not help the situation, the motor continued to sputter and he continued to lose altitude. He attempted to turn back to the Reid-Hillview Airport, but saw that he could not make it. He then observed a schoolyard and a baseball field and decided to make a forced landing there. He circled this field, losing altitude all the while, with his motor missing and not taking the throttle. He was unable to reach the baseball field and crashed into plaintiff's house, causing the damages for which this action was brought. The expert evidence was to the effect that the application of carburetor heat would not cause the motor to miss. White testified that, in his opinion, the accident was caused by pilot failure, and that he thought that the Civil Aeronautics Administration had so found. Lenerville testified that he believed the accident was caused by motor failure.

The appellant filed a first amended complaint in five counts. The first cause of action was against Galindo for trespass, but alleges that respondents and Lenerville were in the business of renting planes to untrained pilots; that such business was extrahazardous; that respondents owned the plane involved and that such plane was rented to Galindo by Lenerville, the latter acting as the duly authorized agent of respondents. The second cause of action was against all defendants, including respondents, incorporates the agency allegations of count one and specially alleges that respondents, acting through their agent Lenerville, negligently permitted Galindo, an untrained and unlicensed pilot, to use the plane.

The third cause of action was directed against respondents, and charged them with negligent maintenance and repair of the plane which caused the accident. At the inception of the trial it was stipulated that this count should be dropped "in that there is now no claim made that that Defendant [respondents] negligently maintained an airplane or that the airplane was in a defective condition."

The fourth cause of action was against Lenerville alone, but the fifth was against respondents, alleging an absolute liability based on the agency allegations of count one. Thus, at the trial, only the second and fifth causes of action involved respondents, and in both it was alleged that there was an agency relationship between Lenerville and respondents, the fifth seeking to impose an absolute liability, and the second seeking to impose liability as a result of negligence.

Respondents contend that the only causes of action pleaded against respondents are based on a claimed agency relation-

ship between Lenerville and respondents, and that on this appeal appellant seeks to impose liability on respondents on the theory that they directly participated in putting the airplane in the air, that such activity is extrahazardous, and that in such cases all participants, regardless of agency, are absolutely liable for damages caused by the pilot. Respondents urge that there was a total failure of proof as to agency, and that for that reason the nonsuit was proper. It is also claimed that if a cause of action regardless of agency was shown, which they deny, there was a fatal variance between the pleading and the proof.

We agree that the first amended complaint pleads that Lenerville was the agent of respondents, and we are further of the opinion that there is no evidence, and no reasonable inference from the evidence, that such an agency relationship, in fact, existed. There is no evidence that Lenerville acted or agreed to act under respondents' direction or control, or that he agreed to act on behalf of respondents. Such evidence is essential to prove an agency. (*Malloy* v. *Fong*, 37 Cal.2d 356 [232 P.2d 241]; *Edwards* v. *Freeman*, 34 Cal.2d 589 [212 P.2d 883].) The transaction was simply one whereby White rented a plane to Lenerville, knowing that Lenerville intended to rent it to someone else, probably a student.

However, although there was a failure of proof as to agency and a variance, the argument that either misled or prejudiced respondents is not impressive. Of course, it would have been better practice for appellant originally to have pleaded a cause of action based on the theory of absolute liability regardless of agency, or to have moved to amend to conform to proof to allege such a cause of action. But the failure to do so is not always fatal. It is expressly declared by statute that "No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice." (Code Civ. Proc., § 469; see *Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375 [240 P.2d 580]; *Lehmann* v. *Mitchell*, 109 Cal. App.2d 719 [241 P.2d 573]; *Martin* v. *Henderson*, 124 Cal.App.2d 602 [269 P.2d 117]; *Treu* v. *Kirkwood*, 42 Cal.2d 602 [268 P.2d 482].) If appellant is correct that ownership of the plane and knowing participation by such owner in permitting it to fly, is sufficient to impose absolute liability on the owner, then respondents could not possibly have been prejudiced by the pleading basing such liability on agency.

The appellant simply pleaded too much. But she did plead ownership of the plane by respondents, and she did plead the renting of it by respondents to Lenerville knowing someone else was going to fly it. If appellant's theory is correct, that sufficiently alleged a cause of action based on absolute, or, as stated by appellant, "strict" liability. The alleged failure of proof and variance were immaterial on this issue, and should be disregarded.

This brings us to the main question presented on this appeal —is the owner of a plane who leases it to a competent flying instructor, knowing it is to be flown by a student pilot, strictly or absolutely liable to third persons for ground damage caused by the student pilot while flying the plane? As already pointed out, reasonably interpreted the evidence shows that respondents knew or should have known when they rented the plane to Lenerville that he intended to rent it to a student pilot, and in that sense participated in sending the plane aloft. In exhaustive and extensive briefs appellant argues for the imposition on owners or lessees of planes who participate in sending them aloft of the doctrine of strict liability so as to impose liability against such owners or lessees for damages in favor of ground victims when the pilot makes a forced landing outside established landing areas. Appellant would like to treat this as a question of first impression in this state, and to make the issue one of public policy that should be decided by the courts and not by the Legislature. As will be seen, the problem is not one of first impression, and the public policy arguments should be addressed to the Legislature and not to the courts.

The basic question involved is whether renting airplanes to a qualified instructor when it is foreseeable that a student pilot will fly the plane is engaging in such an extrahazardous occupation that the courts should hold that the doctrine of strict liability should be applied. The Restatement of Torts has adopted the view that flying is an extrahazardous activity and for that reason the doctrine of strict or absolute liability should be applied. Section 519 of the Restatement provides that, except in certain cases not here involved, "one who carries on an ultrahazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultrahazardous, although the utmost care is exercised to prevent the harm." Section 520 defines an ultrahazardous activity as one which—

"(a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and

"(b) is not a matter of common usage."

In Comment b to this section the authors of the Restatement state: "An activity may be ultrahazardous because of the instrumentality which is used in carrying it on, the nature of the subject matter with which it deals or the condition which it creates. Thus, aviation in its present state of development* is ultrahazardous because even the best constructed and maintained aeroplane is so incapable of complete control that flying creates a risk that the plane even though carefully constructed, maintained and operated, may crash to the injury of persons, structures and chattels on the land over which the flight is made."

Comment d to the same section reads: "An activity may be ultrahazardous because it is of a sort which must be carried on under conditions which cannot be predicted at the time it is entered upon, and which, if they arise, are incapable of being so provided against as to make the activity safe. Thus, one of the risks of aviation is that the plane being flown at a high altitude and over a large area may encounter dangerous weather conditions which would be altogether abnormal on the surface of the earth. The chance that the aviator will encounter them is one of the risks which makes aviation an ultrahazardous activity. In this particular aviation differs from activities which are carried on on the surface of the earth, the safety of which is rarely dependent upon unexpectable weather conditions."

In Comment e the authors point out that aeroplanes and automobiles are to be distinguished in this respect because "automobiles have come into such general use that their operation is a matter of common usage. This, together with the fact that the risk involved in the careful operation of a carefully maintained automobile is slight, is sufficient to prevent their operation from being an ultrahazardous activity." In Comment g, after stating that to be ultrahazardous the activity must be both one that cannot be made safe by utmost precaution, and one not commonly carried on, the authors continue: "Thus, the use of automobiles has become so common to the great mass of inhabitants of the United States and the residuum of risk which cannot be eliminated

---

*The Restatement of Torts was adopted and promulgated by the American Law Institute on May 12, 1938, over 16 years ago.

by careful driving and maintenance is so small that the driving of ordinary types of automobiles is not regarded as ultrahazardous. On the other hand, aviation has not as yet become either a common or an essential means of transportation. This, coupled with the fact that as yet aeroplanes have not been so perfected as to make them subject to a certainty of control approximating that of which automobiles are capable, and with the serious character of harm which an aeroplane out of control is likely to do to persons, structures or chattels on the land over which it flies make it proper to regard aviation as an ultrahazardous activity.''

This concept of absolute liability of owners of planes is also contained in the Uniform Aeronautics Act proposed by the Commissions on Uniform State Laws in 1922. (11 U.L.A. 159.) Section 4 of that proposed statute first declares that flight of aircraft over the lands and waters of the state is, subject to certain exceptions, lawful, and then continues: ''The landing of an aircraft on the lands or waters of another, without his consent, is unlawful, except in the case of a forced landing. For damages caused by a forced landing, however, the owner or lessee of the aircraft or the aeronaut shall be liable, as provided in Section 5.'' Section 5 of the proposed act reads as follows: ''The owner of every aircraft which is operated over the lands or waters of this State is absolutely liable for injuries to person or property on the land or water beneath, caused by the ascent, descent or flight of the aircraft . . . whether such owner was negligent or not, . . . If the aircraft is leased at the time of the injury to person or property, both owner and lessee shall be liable, and they may be sued jointly, or either or both of them may be sued separately. An aeronaut who is not the owner or lessee shall be liable only for the consequences of his own negligence.''

At one time over 20 states had adopted this proposed act, most of them during the nineteen-twenties. Some of these states adopted the proposed uniform act *in toto,* while others adopted it with various modifications, particularly of section 5. (See 11 Uniform Law Annotated, p. 162 et seq.) In August of 1943 this proposed act was declared to be ''obsolete'' and was ''withdrawn'' by the commissioners.

Some states, in reliance on the Restatement, have adopted the doctrine of strict or absolute liability, and some have refused to follow the Restatement in this respect. So far as the liability of the owner of a plane who rents it to another is concerned, the general prevailing view is that in the absence

of statute, or in the absence of an agency relationship, the bailor is not only not absolutely liable for the acts of the bailee, but is not liable for the negligence of the bailee, at least in the absence of knowledge on the part of the bailor that the bailee is incompetent or reckless. The following paragraph quoted from a 1949 annotation in 4 American Law Reports 2d 1306 properly summarizes the current trend of the law:

"The courts and the law formerly looked upon aviation with the viewpoint still expressed in the American Law Institute, Restatement, Torts, Vol. 3, § 520, holding that aviation is an ultra-hazardous activity, similar to the operation of automobiles in the early days of the horseless carriage, and requiring those who take part in it to observe the highest degree of care. The Uniform Aeronautic Act, adopted in time by twenty-three states, imposed absolute liability on the owner, as well as the operator or lessee, of every aircraft for any damage to person or property caused by its operation provided there was no contributory negligence on the part of him who was thus harmed. With the passage of time, however, this view came to be modified, and the trend of decisions established it to be the general rule that, properly handled by a competent pilot exercising reasonable care, an airplane is not an inherently dangerous instrument, so that in the absence of statute the ordinary rules of negligence control, and the owner (or operator) of an airship is only liable for injury inflicted upon another when such damage is caused by a defect in the plane or its negligent operation. By 1945, coincident with the opening of the postwar civilian aviation period, the number of states retaining the portions of the Uniform Aeronautic Act dealing with an owner's liability had dropped to eighteen." (See also 6 Am.Jur. (Rev.), § 60, p. 36.)

California is in accord with this modern trend in the authorities. According to information received from the legislative counsel, the proposed uniform act containing the absolute liability provisions above quoted was adopted by the Legislature in 1923, 1925, and 1927, but in each instance was pocket vetoed by the governor. In 1929 the proposed uniform act was again introduced but did not pass. In its place the Legislature adopted, and the governor signed, the California Air Navigation Act. (Stats. 1929, ch. 850, p. 1874.) This statute was not based on the proposed uniform act and contained nothing pertinent on the question of lia-

bility. In 1933, section 11½ was added to the California Air Navigation Act. (Stats 1933, ch. 438, p. 1135.) By this provision a so-called "guest law" for pilots of planes similar to the one applicable to automobile drivers (Veh. Code, § 403) was adopted under which pilots were relieved of liability to nonpaying passengers for ordinary negligence and made liable only in case of their intoxication or wilful misconduct. In 1947 the proposed uniform act with its provisions for absolute liability was again introduced into the Legislature. This bill died in committee. At the same time another bill adopting most of the provisions of the proposed uniform act, but omitting the provisions as to absolute liability, was introduced, passed and signed. This statute also repealed the 1929 California Air Navigation Act, as amended. (Stats. 1947, ch. 1379, p. 2927.) In place of sections 4 and 5 of the proposed uniform act the Legislature adopted the following provision in subdivision (d) of section 2 of the act:

"It is further declared that flight in aircraft over the lands and waters of this State is lawful, unless at altitudes below those prescribed by federal authority, or unless so conducted as to be imminently dangerous to persons or property lawfully on the land or water beneath. The landing of an aircraft on the lands or waters of another, without his consent, is unlawful except in the case of a forced landing. For damages caused by a forced landing, the owner or lessee of the aircraft or the operator thereof shall be liable, as provided by law."

In 1953 the Legislature codified most of the statutes relating to aviation as part 1, division 9, of the Public Utilities Code. (Stats 1953, ch. 151, p. 927.) With minor rephrasing not here important, section 2, subdivision (d) of the 1947 act is now section 21403 of the Public Utilities Code. There is no other California statute referring to liability of bailors or owners of planes for forced landings.

This legislative history certainly supports the reasonable inference that the Legislature in 1947 deliberately refused to adopt the provisions of the proposed uniform act as to absolute liability and instead intended that the liability of owners, lessees or operators of planes should be governed by the normal rules applicable to bailments, *respondeat superior,* and negligence. Certainly the legislative history does not permit the inference that the Legislature intended to change the ordinary rules applicable to bailments, *respondeat superior,* and negligence.

The only case authority to which we have been referred discussing the liability provisions of the 1947 act is *Johnson* v. *Central Aviation Corp.*, 103 Cal.App.2d 102 [229 P.2d 114], decided in 1951. In this case the accident occurred at the airport, and did not involve a forced landing. The plane that caused the damage was owned by the defendants and was being operated by one Gross, a student pilot entitled to fly solo who was taking lessons from Central Aviation Corporation, a company engaged in the business of instructing student pilots. On the morning in question the student pilot intended to fly solo. At the field he started the motor of the plane he customarily used, and, as he had done in the past, started to taxi it to the offices of the corporation for checking out. In so operating the plane, and while still at the airport, he ran into a plane of plaintiff's. Judgment was rendered against Central Aviation Corporation, as well as against others. On the appeal of Central Aviation Corporation this portion of the judgment was reversed. It was held that as between a student pilot renting a plane owned by the flying school from which he was taking lessons, and the owner-flying school, there was only an ordinary contractual relationship of bailment, and that the relationship of principal and agent or master and servant did not exist so as to impose liability on the Central Aviation Corporation for the negligence of its student. In so holding, the court stated (p. 111) : "As a student taking instruction he was neither the servant nor the agent of the flying school while doing those things properly within his course of instruction. By what occurred we hold he did not change that status so as to make the school liable for his acts on the basis of *respondeat superior.*"

On the same page the court continued as follows: "Generally speaking, there is nothing about airplanes which takes them out of the category of chattels which may be bailed to another for his use, or which another may be permitted by the owner to use, without imposing upon the owner liability for such bailee's or permittee's negligent operation. It is true that the law formerly looked upon aviation as an ultrahazardous activity and the Uniform Aeronautics Act which was once adopted in many states did impose absolute liability on the owner as well as the operator or lessee of every aircraft for any damage to person or property caused by its operation unless there was contributory negligence on the part of the injured person. However, this view has come to be modified and now it is considered that properly handled

by a competent pilot an airplane is not an inherently dangerous instrument. Our Legislature has adopted this more modern view and has declared that as to passengers the liability of the owner or pilot of an aircraft shall be determined by the rules of law applicable to torts on the lands or waters of this state arising out of similar relationships, and has further declared that 'the liability of the owner of one aircraft to the owner of another aircraft, or to the operators or passengers on either aircraft, for damage caused by collision on land or in the air, shall be determined by' the same rules. (State Aeronautics Commission Act, § 2, subds. (f) and (g) . . .) We have no statute respecting airplanes, fixing liability upon owners for permitted use such as we have with respect to automobiles.'' What the court stated about subdivisions (f) and (g) of section 2 of the act is equally applicable to subdivision (d) of the same section. It will also be noted that here the court was talking about the liability of the flying school and not of a bailor who had rented a plane to the flying school. Obviously, if the flying school, in the absence of negligence on its part, is not strictly liable for the acts of a student pilot, the person renting the plane to the flying school is not liable.

Of course, the Johnson case was dealing with damage caused by a student pilot at the airport and not for damages caused by a forced landing, but what is stated about the relationship between the owner and the student pilot is equally applicable to both situations. Appellant contends that what the court said about the provisions of the state act was dicta. Perhaps what the court said on this subject was dicta, but it was sound dicta. At any rate, it is dicta no longer, because we adopt it as part of this opinion.

California has adopted a policy of imposing strict liability on owners or bailors in connection with certain activities. But this state has limited such policy to those activities that are obviously and plainly ultrahazardous. Thus, drilling an oil well in a settled area that "blows off," damaging adjoining properties, imposes liability regardless of the care used (*Green v. General Petroleum Corp.*, 205 Cal. 328 [270 P. 952, 60 A.L.R. 475]); or where hydrocyanic gas used to exterminate cockroaches escapes (*Luthringer v. Moore*, 31 Cal.2d 489 [190 P.2d 1]); or where the defendant farmer employed an independent contractor to spray his farm with gas containing arsenic and the fumes from such spraying killed plaintiff's bees located on nearby land (*Miles v. A. Arena & Co.*, 23

Cal.App.2d 680 [73 P.2d 1260]). Cases involving other ultrahazardous activities can undoubtedly be cited. But the operation of an airplane in the year 1954 is not such a dangerous activity that it can be placed in this category.

Appellant makes a strong public policy argument to the effect that the risk of damage to third parties owning property over which airplanes are driven, at least by student pilots, should be borne by the owners of planes, who can and should insure themselves against such risk, and not by the innocent property owner. There may be some merit to these arguments as a matter of policy, but such arguments should be addressed to the Legislature and not to the courts. Once it has been determined that flying, even student flying, is not *per se* ultrahazardous, the question of liability must be determined by general principles of liability unless or until the Legislature, as it has done in the case of automobiles (Veh. Code. § 402), provides to the contrary.

Included within the above-discussed contention of appellant is necessarily included a more limited argument, that is, that if the owner generally is not to be held strictly liable when he leases a plane to a regular pilot for the damage caused by the pilot, such liability should attach when the plane is rented for the use of a student pilot because, it is claimed, such a pilot is inexperienced and incompetent. We have already held that it is a reasonable inference from the evidence in the instant case that White knew or should have known that Lenerville rented the plane for the purpose of rerenting it to a student pilot. We have also held that the bailor of a plane is not liable for the acts of a pilot to whom the plane is rerented for ground damage caused by the acts of the pilot. This is based on the normal rules applicable to bailments. Normally a bailor is not liable to third persons for the bailee's acts causing damage, even negligent acts, in the use of the bailed article. (*Gulzoni* v. *Tyler*, 64 Cal. 334 [30 P. 981]; *Baugh* v. *Rogers*, 24 Cal.2d 200 [148 P.2d 633, 152 A.L.R. 1043].) But to this rule there is an exception to the effect that a bailor is liable for the negligent acts of the bailee when he entrusts a vehicle to a person known by him to be incompetent or reckless. (*Rocca* v. *Steinmetz*, 61 Cal.App. 102 [214 P. 257]; *Lane* v. *Bing*, 202 Cal. 590 [262 P. 318].) Appellant contends that permitting a plane to be flown solo by a student pilot comes within such exception. In other words, that renting a plane to a competent flying instructor knowing that instructor intends to rent it to a

student pilot, amounts to bailing the chattel to an inexperienced, and therefore reckless or incompetent person. This reasoning, in effect, amounts to imposing the doctrine of absolute liability on all bailors of planes to be used in student instruction. Such reasoning is not convincing. It is predicated upon the assumption that it is a logical inference that a student pilot is *per se* incompetent, reckless and inexperienced, regardless of the care he might exercise. We cannot say, as a matter of law, that all student pilots are incompetent, because such is not the fact. It cannot even be inferred that student pilots, under competent instruction, are more prone to accidents, or cause more accidents than regular pilots. For this reason, the exception to the rule urged by appellant is not here applicable.

Appellant next seeks to impose liability on respondents on the theory that White knew that Galindo was an incompetent pilot. The evidence does support the inference that White knew that Galindo was going to fly the plane, and knew who Galindo was. But there is no evidence that White knew anything about Galindo's competency as a pilot. He knew or should have known that Galindo, for some undefined reason, had been turned down as a student by his partner, but that was before any instruction had started. Even if the incident of "buzzing" the house by Galindo be considered as some evidence of recklessness, the evidence is uncontradicted to the effect that White did not know of this incident until after the accident here involved. There is not one word in evidence to the effect that White knew that Galindo was reckless, incompetent or inexperienced.

Of course, White is in a different legal position from Lenerville. The latter was Galindo's instructor. He knew of Galindo's competency. If it be assumed that the evidence shows that Galindo was a reckless or incompetent pilot, a point on which we express no opinion, Lenerville would know that fact, and might be liable accordingly. But White's only connection with the transaction is that he rented the plane to Lenerville, a competent flying instructor, knowing that Lenerville intended to rent it to Galindo. White was not a participant, in a legal sense, in the flight taken by Galindo. He was under no duty to investigate the qualifications of Galindo. He could and did leave that to Lenerville. He knew nothing about Galindo's flying ability. That being so, liability cannot be imposed upon him under the exception under discussion.

In an attempt to escape the application of this reasoning to this case, appellant next contends that under the oral rental arrangement between respondents and Lenerville they became joint adventurers in the business of renting planes to students, and therefore if Lenerville was negligent (a point on which we express no opinion), respondents, as joint adventurers, would also be liable. Under no interpretation of the evidence were Lenerville and respondents engaged in a joint venture. Under the arrangement one flying school temporarily out of planes rented from the other flying school a plane for the use of its students. Not only was joint venture not pleaded, but there was not the requisite common purpose, the sharing of profits or losses, or the mutual right of control over the conduct of each other, necessary to create a joint enterprise. Once White rented a plane to Lenerville, White had no right of control or interest in its use. (*Larson* v. *Lewis-Simas-Jones Co.*, 29 Cal.App.2d 83 [84 P.2d 296].) There was no evidence, or inference from the evidence, sufficient to present the issue of joint enterprise.

The last point necessary to discuss is whether there is any evidence of the respondents' negligence in renting to Lenerville an instrumentality known to them to be defective.

It is doubtless the law that a bailor or seller is generally liable to third persons for injuries if such chattel was defective at the time of the bailment, or sale, and the defect contributed to the injury. (*Benton* v. *Sloss*, 38 Cal.2d 399 [240 P.2d 575] ; *MacPherson* v. *Buick Motor Co.*, 217 N.Y. 382 [111 N.E. 1050, Ann.Cas. 1916C 440, L.R.A. 1916F 696].)

The difficulty is that in the present case there is no evidence at all that the plane was defective at the time of the bailment. White testified that he believed the accident was caused by pilot failure. Galindo testified that the motor sputtered, and of his inability to get power out of the engine, but this does not raise an inference that the plane was defective when rented. It must be remembered that after the plane was rented to Lenerville, he and Galindo flew it dual for 30 or 40 minutes without experiencing any difficulty in keeping it in the air, even with the added weight of Lenerville. Obviously, the plane was mechanically sound at the time it was rented to Lenerville.

It should also be pointed out that, although appellant in his third cause of action charged respondents with negligent maintenance and repair of the plane, counsel for respondents, in the presence of counsel for appellant, told the court that it

had been stipulated that the third cause "would be dropped in that there is now no claim made that that Defendant negligently maintained an airplane or that the airplane was in a defective condition." Counsel for appellent replied: "That's correct, Judge." The judge then asked: "Do I understand then that the third Cause of Action is dismissed?", to which counsel for appellant replied "I think that's correct. Call it dismissed or abandoned." The judge then stated: "It is out, in any event." To which counsel for appellant stated "Yes." During the trial there was no attempt made to withdraw this stipulation, nor was any charge made that the plane was defective when rented. Under such circumstances the appellant is in no position to urge the point now.

The other points raised do not require discussion. The judgment of nonsuit in favor of White and Sautter, doing business as a partnership under the name Garden City Aero, is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied December 10, 1954, and appellant's petition for a hearing by the Supreme Court was denied January 3, 1955. Carter, J., was of the opinion that the petition should be granted.