[No. 53125–1.  En Banc.  December 10, 1987.]

DOUGLAS CROSBY, *Respondent*, v. COX AIRCRAFT COMPANY OF WASHINGTON, ET AL, *Appellants*.

*J. Grahame Bell,* for appellants.

*Hackett, Beecher, Hart, Branom & Vavrichek* and *Theodore H. Millan,* for respondent.

*Keith Gerrard* and *Richard C. Coyle* on behalf of The Boeing Company, amici curiae for appellants.

*Daniel E. Huntington, Bryan P. Harnetiaux,* and *Robert H. Whaley* on behalf of Washington Trial Lawyers Association, amici curiae for respondent.

CALLOW, J.—QUAERE: Should owners and operators of flying aircraft be held strictly liable for ground damage caused by operation of the aircraft, or should their liability depend on a finding of negligence?

The trial court determined that strict liability was applicable and awarded judgment in favor of the plaintiff landowners. We find that the general principles of negligence should control. We reverse and remand for trial.

## I

The case involves a claim for property damage caused when a plane owned by Cox Aircraft Co. and piloted by Hal Joines (the pilot) crash–landed onto Douglas Crosby's property. The plane was a DeHavilland DHC–3 Otter aircraft. Its engine had recently been converted from piston–driven to turbine and the conversion had been undertaken in strict conformity with Federal Aviation Administration (FAA) requirements. FAA certification of the plane's fuel system was still pending at the time of the accident.

On December 19, 1984, the pilot flew the airplane over the Olympic Peninsula and then turned back to Seattle, intending to land at Boeing Field. However, the engine ran out of fuel in mid–flight, and the pilot was forced to crash–land the plane at Alki Point in West Seattle. The plane landed on the roof of Crosby's garage, causing $3,199.89 in damages.

Crosby sued both the pilot and Cox Aircraft. His complaint raised the following alternative allegations: (1) that the pilot was negligent in his operation of the plane; (2) that Cox Aircraft was negligent in its maintenance of the plane; (3) that Cox Aircraft, the alleged employer of the pilot, should be held vicariously liable for all negligence of

the pilot under the doctrine of respondeat superior; and (4) that both the pilot and Cox Aircraft should be held strictly liable for all damages caused by the crash landing. The pilot and Cox Aircraft denied liability and filed a third party complaint against Parker Hannifin Corporation alleging that Parker had equipped the plane with a defective fuel system control valve which failed to operate properly, thus causing the plane's engine to run out of fuel and forcing the pilot to make the crash landing.

The trial court granted partial summary judgment for Crosby, holding that both the pilot and Cox Aircraft were strictly liable for all damage done to Crosby's property. The court did not address Crosby's negligence claims, nor the third party complaint against Parker. The pilot and Cox Aircraft appealed. We accepted certification.

The Boeing Company and the Washington State Trial Lawyer's Association (WSTLA) have both filed amicus curiae briefs regarding the appropriate standard of liability to be imposed. Boeing argues that the liability of aircraft owners and operators for ground damage should be governed by a negligence standard. WSTLA contends (as does plaintiff Crosby), on the other hand, that strict liability should be applied. The defendants argue for yet a third standard—a "rebuttable presumption" of negligence on the part of the aircraft owner and operator. We hold that the general principles of negligence control.

## II

This is the first case in this State to directly deal with the standard of liability governing ground damage caused by aircraft. *Mills v. Orcas Power & Light Co.,* 56 Wn.2d 807, 821 n.6, 355 P.2d 781 (1960) alluded to this issue, but only in dicta. No subsequent cases have considered the question, and the Legislature has enacted no statute on the matter.

Plaintiff Crosby and amicus party WSTLA urge us to adopt Restatement (Second) of Torts § 520A (1977):

§ 520A. Ground Damage From Aircraft

If physical harm to land or to persons or chattels on the ground is caused by the ascent, descent or flight of aircraft, or by the dropping or falling of an object from the aircraft,

(a) the operator of the aircraft is subject to liability for the harm, even though he has exercised the utmost care to prevent it, and

(b) the owner of the aircraft is subject to similar liability if he has authorized or permitted the operation.

This provision establishing strict liability is said to be a "special application" of §§ 519–520, the Restatement sections governing liability for "abnormally dangerous" activities. (*See* § 520A, comment *a*). Sections 519–520 provide:

§ 519. General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

§ 520. Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) *likelihood* that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

The defendants urge us to reject Restatement § 520A. They contend that aviation can no longer be designated an "abnormally dangerous activity" requiring special rules of liability. We agree.

In the early days of aviation, the cases and treatises were

replete with references to the hazards of "aeroplanes". The following assessment is typical:

[E]ven the best constructed and maintained aeroplane is so incapable of complete control that flying creates a risk that the plane even though carefully constructed, maintained and operated, may crash to the injury of persons, structures and chattels on the land over which the flight is made.

Restatement of Torts § 520, comment *b* (1938). As colorfully stated in W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 78, at 556 (5th ed. 1984):

Flying was of course regarded at first as a questionable and highly dangerous enterprise, the province exclusively of venturesome fools . . .

*See also Rochester Gas & Elec. Corp. v. Dunlop,* 148 Misc. 849, 851–52, 266 N.Y.S. 469 (1933); Baldwin, *Liability for Accidents in Aerial Navigation,* 9 Mich. L. Rev. 20 (1910); Newman, *Damage Liability in Aircraft Cases,* 29 Colum. L. Rev. 1039 (1929). In 1922 the Commission on Uniform State Laws proposed a new Uniform Aeronautics Act which, *inter alia,* made owners of aircraft strictly liable for all ground damage caused by the "ascent, descent or flight of the aircraft." Twenty–three states originally adopted this act by statute. By 1943, however, the Commissioners recognized that the act had become "obsolete", and it was removed from the list of uniform laws. 1 L. Kreindler, *Aviation Accident Law* § 6.01[1], at 6–1 to 6–2 (1986).

The number of states imposing strict liability has diminished significantly. At present, only six states retain the rule, and even these states apply it only to the owner of the aircraft. The aircraft operator remains liable only for damages caused by his own negligence. *See* Del. Code Ann. tit. 2, § 305 (1985); Hawaii Rev. Stat. § 263–5 (1985); Minn. Stat. § 360.012(4) (1986); N.J. Stat. Ann. § 6:2–7 (West 1973); S.C. Code § 55–3–60 (1977); Vt. Stat. Ann. tit. 5, §§ 224–225 (1972).

█ The modern trend followed by a majority of states is to impose liability only upon a showing of negligence by

either the aircraft owner or operator. 1 L. Kreindler § 6.01[5], at 6–9. Several states have legislated this rule by providing that ordinary tort law (or the law applicable to torts on land) applies to aviation accidents. *See, e.g.,* Ark. Stat. Ann. § 74–110 (1979); Idaho Code §§ 21–205 (1977); N.D. Cent. Code § 2–03–05 (1975); Pa. Cons. Stat. Ann. tit. 74, § 5502 (Purdom Supp. 1987); Tenn. Code Ann. § 42–1–105 (1980). Other jurisdictions have case law to this effect. *See, e.g., Daly v. United States,* 792 F.2d 1081, 1085 (11th Cir. 1986) (applying Florida law); *Brooks v. United States,* 695 F.2d 984, 987 (5th Cir. 1983) (applying Texas law); *Mackey v. Miller,* 221 Va. 715, 718, 273 S.E.2d 550 (1981). Moreover, a number of courts have expressly disavowed the notion that aviation is an "ultrahazardous activity" requiring special rules of liability. *Boyd v. White,* 128 Cal. App. 2d 641, 655, 276 P.2d 92 (1954); *Wood v. United Air Lines,* 32 Misc. 2d 955, 960, 223 N.Y.S.2d 692 (1961), *aff'd,* 16 A.D.2d 659, 226 N.Y.S.2d 1022, *appeal dismissed,* 11 N.Y.2d 1053, 184 N.E.2d 180, 230 N.Y.S.2d 207 (1962); *Little v. McGraw,* 250 Ark. 766, 769, 467 S.W.2d 163 (1971). As observed in *Boyd,* at 651:

"The courts and the law formerly looked upon aviation with the viewpoint still expressed in the American Law Institute, Restatement, Torts, Vol. 3, § 520, holding that aviation is an ultra–hazardous activity, similar to the operation of automobiles in the early days of the horseless carriage, and requiring those who take part in it to observe the highest degree of care. The Uniform Aeronautic Act, adopted in time by twenty–three states, imposed absolute liability on the owner, as well as the operator or lessee, of every aircraft for any damage to person or property caused by its operation provided there was no contributory negligence on the part of him who was thus harmed. With the passage of time, however, this view came to be modified, and the trend of decisions established it to be the general rule that, properly handled by a competent pilot exercising reasonable care, an airplane is not an inherently dangerous instrument, so that in the absence of statute the ordinary rules of negligence control, and the owner (or operator) of an

airship is only liable for injury inflicted upon another when such damage is caused by a defect in the plane or its negligent operation. By 1945, coincident with the opening of the postwar civilian aviation period, the number of states retaining the portions of the Uniform Aeronautic Act dealing with an owner's liability had dropped to eighteen." (See also 6 Am. Jur. (Rev.), § 60, p. 36.) (Quoting an annotation in 4 A.L.R.2d 1306 (1949).)

We have discovered no cases relying on Restatement (Second) of Torts § 520A. That section is said to be a "special application" of § 519 and § 520(a)–(f), which impose strict liability on persons engaging in abnormally dangerous activities. An analysis of the individual factors listed in § 520 further persuades us that strict liability is inappropriate here.

Factor (a) of § 520 requires that the activity in question contain a "high degree of risk of some harm to the person, land or chattels of others". No such showing has been made. Indeed, statistics indicate that air transportation is far safer than automobile transportation. *See, e.g.,* 3 F. Harper, F. James & O. Gray, *Torts* § 14.13, at 309 n.64 (1986); Comment, *Aviation Law: Owner–Lessor Liability— The Need for Uniformity,* 36 Me. L. Rev. 93, 98–99 (1984). Factor (b) speaks to the gravity of the harm—that is, in the unlikely event that an airplane accident occurs, whether there is a "likelihood that the [resulting harm] will be great" it is apparent that this possibility is present. However, this must be further evaluated in light of factor (c), which speaks of the "inability to eliminate the risk by the exercise of reasonable care". Given the extensive governmental regulation of aviation, *see generally* 14 C.F.R. ch. 1 (1978) (Federal Aviation Administration regulations), and the continuing technological improvements in aircraft manufacture, maintenance and operation, we conclude that the *overall* risk of serious injury from ground damage can be sufficiently reduced by the exercise of due care. Finally, factors (d), (e), and (f) do not favor the imposition of strict liability. Aviation is an activity of "common usage", it is

appropriately conducted over populated areas, and its value to the community outweighs its dangerous attributes. Indeed, aviation is an integral part of modern society.

The causes of aircraft accidents are legion and can come from a myriad of sources. Every aircraft that flies is at risk from every bird, projectile and other aircraft. Accidents may be caused by improper placement of wires or buildings or from failure to properly mark and light such obstructions. The injury to the ground dweller may have been caused by faulty engineering, construction, repair, maintenance, metal fatigue, operation or ground control. Lightning, wind shear and other acts of God may have brought about a crash. Any listing of the causes of such accidents undoubtedly would fall short of the possibilities. In such circumstances the imposition of liability should be upon the blameworthy party who can be shown to be at fault. In *King v. United States,* 178 F.2d 320 (5th Cir. 1949), a United States Army Air Force student pilot got drunk and took off in a training plane at midnight. Shortly thereafter he crashed into the plaintiff's home causing damages. The plaintiff brought suit under the Federal Tort Claims Act against the United States. The court found that the act of the student pilot was without the knowledge or consent of the Air Force, was unauthorized and that the pilot was acting outside of the scope of his duties. The court held that there should be no recovery against the government, stating succinctly:

> In a case of this nature, the United States cannot escape liability if a private person under similar circumstances should be held liable.
>
> There are no special statutory provisions that regulate or govern the responsibility of persons owning and operating airplanes. In the absence of such statutes, the rules of law applicable generally to torts govern. The ordinary rules of negligence and due care are invoked.

*King,* at 321. *See also Dahlstrom v. United States,* 228 F.2d 819 (8th Cir. 1956); *Maitland v. Twin City Aviation Corp.,* 254 Wis. 541, 37 N.W.2d 74 (1949).

We are not persuaded that we should create a special rule of liability governing only ground damage caused by aircraft accidents. We note, for example, that passengers of airplanes involved in accidents must prove negligence to recover damages. *Rathvon v. Columbia Pac. Airlines,* 30 Wn. App. 193, 202–05, 633 P.2d 122 (1981); *Baker v. United States,* 417 F. Supp. 471, 486–88 (W.D. Wash. 1975); 1 L. Kreindler § 6.01[1], at 6–3. As stated in *Rathvon,* at 210–11:

> A carrier's failure to discover a latent defect is not negligence if it exercised the highest degree of care reasonably consistent with the practical operation of its business, and used the best precautions that were in common, practical use in the same business and had proved to be effective in discovering defects. *Heggen v. Seattle,* 47 Wn.2d 576, 288 P.2d 830 (1955).

> We conclude that whether or not CPA failed to exercise the highest degree of care according to the standards expressed above remains a genuine issue of material fact.

This is true even though the likelihood of serious injury to a passenger is at least as great as is the case with persons or property on the ground.

We also emphasize that, although the plaintiff's recovery will depend on a showing of negligence, the plaintiff may of course employ the doctrine of res ipsa loquitur, if appropriate, to establish his negligence claim. Res ipsa is now frequently used in aviation crash cases and is widely recognized as an acceptable means of proving negligence. 1 L. Kreindler § 3.09[2], at 3–31. *See generally* Annot., *Res Ipsa Loquitur in Aviation Accidents,* 25 A.L.R.4th 1237 (1983).

Finally, the plaintiff raises an alternative argument that we apply the rule of strict liability to ground damages arising out of "test flights" of aircraft. We decline to do so. Plaintiff has cited no authority to support his claim that test flights of aircraft qualify as "abnormally dangerous" under Restatement (Second) of Torts §§ 519–520. The question is not whether test flights are more dangerous than routine aviation flights, but rather, whether they are

590

so inherently dangerous that a "high degree of risk of harm" cannot be eliminated by the exercise of reasonable care. § 520(a), (c). In light of the extensive government regulation regarding the design, development, and testing of new and modified aircraft, *see generally* 14 C.F.R. ch. 1, subchapter C (1978) (Federal Aviation Administration certification procedures and airworthiness standards), we conclude that test flights are not abnormally dangerous.

We hold that owners and operators of flying aircraft are liable for ground damage caused by such aircraft only upon a showing of negligence.

The partial summary judgment entered in favor of the plaintiff is reversed and the cause is remanded for trial.

UTTER, DOLLIVER, ANDERSEN, and DURHAM, JJ., concur.

BRACHTENBACH, J. (dissenting)—What a peculiar, aberrant twist of tort law is created by the majority. Almost a decade ago we held that when a wine glass shatters in the hands of a wine drinker, the seller of the wine, who merely supplied the glass, is strictly liable. The law demanded and gave compensation without proof of fault. *Shaffer v. Victoria Station, Inc.,* 91 Wn.2d 295, 588 P.2d 233 (1978). Today the majority tells the wholly innocent, inactive homeowner into whose home an airplane suddenly crashes "you must prove by a preponderance of the evidence that someone was at fault; never mind that you had no part in this damage, *go forth and prove negligence and if you cannot, the loss is all yours.*" How can that be? The majority's answer is that it cannot fit these facts into a magic phrase—abnormally dangerous—which started in an *1868* case from England, *Rylands v. Fletcher,* 3 L.R.–E. & I. App. 330 (1868).

In fact and theory, it is a policy question whether to impose liability upon the pilot and owner of an airplane which crashes into the *person or property of a* wholly innocent person on the ground.

Compelling, persuasive policy reasons exist to impose

such strict liability. Those reasons should be explored and evaluated rather than simply accepting the pigeonhole conclusion that aviation is not abnormally dangerous as defined by the black letter rule of the Restatement (Second) of Torts, therefore, ipso facto, strict liability cannot be imposed. If the Restatement (Second) of Torts is to be followed, as the majority proposes, strict liability should result as discussed hereafter.

Unfortunately, the majority totally fulfills the prophecy of one text writer:

> It is predictable that some courts will be less likely to impose strict liability as a matter of common law development if the case cannot be fitted into some familiar mold such as trespass or abnormally dangerous activity. While this fact must be recognized, it should be regretted. Surely the step so clearly called for here is a small one as compared with many that courts have taken without aid of statute.

3 F. Harper, F. James & O. Gray, *Torts* § 14.13, at 311 n.68 (2d ed. 1986).

My position is summarized by the same text:

> As the science of aviation has advanced, there seems to have been increasing reluctance to characterize it as an abnormally dangerous activity. But unwillingness to call aviation abnormally dangerous would not by any means prove that strict liability is inappropriate here. Ample justification for imposing it may be found in frequent difficulties of proof and the fact that these risks are properly allocated to aviation, especially where the victim is no participant in the enterprise.

(Footnote omitted.) 3 F. Harper, F. James & O. Gray, *Torts* § 14.13, at 311 (2d ed. 1986).

If we assume that the aircraft operator is without legal fault, *i.e.*, is not negligent, the policy issue is then clear. Which of two persons should bear the loss? In this case we have a totally innocent, nonacting homeowner whose property is suddenly invaded and damaged by an airplane— operated by the person who voluntarily chose to fly that airplane, for his own purpose and benefit. The result of the

majority is that the wholly innocent, nonactive, nonbene-
fited, but damaged person must shoulder the burden of
proving that the person who set in motion the forces which
caused the damage was negligent.

It is apparent that fairness and common sense suggest
that the loss should not be allocated to the innocent
bystander. Much of the rationale for adopting strict
product liability is applicable here and will be discussed
hereafter.

The underlying policy which dictates strict liability is put
thusly by the late Dean Prosser:

> There is "a strong and growing tendency, where there is
> blame on neither side, to ask, in view of the exigencies of
> social justice, who can best bear the loss and hence to
> shift the loss by creating liability where there has been
> no fault."

(Footnote and citation omitted.) W. Prosser, *Torts* § 75, at
494 (4th ed. 1971).

The majority ignores this underlying policy question by
noting that (1) air transportation is far safer than automo-
bile transportation; (2) extensive governmental regulation
and technological improvements reduce the overall risk of
serious injury on the ground; (3) aviation is an integral part
of society; and (4) the causes of aircraft accidents are
legion. Majority, at 587–88. Those reasons are rather like
consoling the widow by telling her that *statistically* her
husband should have lived another 20 years.

One writer employs an appealing analysis which dictates
strict liability. Professor Vold examines the benefits and
creation of risks from a particular activity. If there is
mutuality in the receipt of benefits and the creation of risks
to others, the standard of liability is negligence. Thus
where each user of a highway receives the direct benefit of
such use but whose presence and conduct increases the risk
of harm to the other, the law of negligence applies. But
one–sidedness in the receipt of benefits and creation of
risks should lead to strict liability. Vold, *Strict Liability for
Aircraft Crashes and Forced Landings on Ground Victims*

*Outside of Established Landing Areas,* 5 Hastings L.J. 1 (1953). This analysis is logical and satisfies the demands of justice. Its application here leads to strict liability.

Another factor favoring strict liability is the reality that the plaintiff in an aviation accident case faces difficult and potentially expensive burdens of proof. "Running through aviation cases, and frequently explaining their unusual results, is the frequently overwhelming difficulty and expense of investigation and preparation, and inherent problems and limitations of proof." 1 L. Kreindler, *Aviation Accident Law* § 1.03[1], at 1–12 (1986).

It is widely recognized that difficulties of proof may justify imposition of strict liability. Indeed, such fact is described as a common feature of strict liability cases. Peck, *Negligence and Liability Without Fault in Tort Law,* 46 Wash. L. Rev. 225, 240 (1971).

The majority's holding is an extreme example of the unfairness of its conclusion and the denial of the realities of litigation. The plaintiff's only claim is for property damage of $3,199.89. The defendant aircraft owner denies negligence in maintenance or operation of the airplane. The defendant denies strict liability application. The defendant joined the manufacturer/distributor of a part used in the fuel system, alleging defective design or manufacture. The defendant joined six other property owners who may have been damaged. The hapless plaintiff, seeking a maximum of $3,199.89, is now, under the majority's holding, faced with the formidable task of proving negligence and is in the midst of a third party fight over the very cause of the crash, plus an anticipated battle of experts over design and manufacture of an integral part of a fuel system in a plane being test flown for FAA certification. It takes no great insight to recognize that the expense of litigation amounts to a denial of plaintiff's right to damages.

The majority emphasizes that "although the plaintiff's recovery will depend on a showing of negligence, the plaintiff may of course employ the doctrine of res ipsa loquitur, if appropriate, to establish his negligence claim." Majority,

at 589. The majority cites 1 L. Kreindler, *Aviation Accident Law* § 3.09[2], at 3–31 (1986), to support its assertion that res ipsa is now frequently used in aviation cases and is widely recognized as an acceptable means of proving negligence. Majority, at 589. That same author, in the same volume, states: "Suffice it to say that the use of *res ipsa loquitur* has been notoriously unsuccessful in airline crash cases." 1 L. Kreindler § 1.03[2], at 1–14. Nor does the majority cite the same author, same volume, § 3.09[3][f], at 3–41: "Thus where the specified purpose of the given flight is to test new or unproven aircraft, and an accident happens, a passenger may not have the benefit of *res ipsa loquitur* even though the defendant is an airline."

The only other authority cited by the majority is Annot., *Res Ipsa Loquitur in Aviation Accidents,* 25 A.L.R.4th 1237 (1983). That annotation contains this conclusion, at page 1244: "Accidents occurring as a result of emergency or forced landings have resulted in a fairly even split on the issue of a defendant's liability under res ipsa loquitur . . ."

Despite the declaration of the majority, there is no certainty of the application of res ipsa loquitur nor the giving of a jury instruction thereon. *Zukowsky v. Brown,* 79 Wn.2d 586, 600, 488 P.2d 269 (1971): "In summary, the procedural effect of a res ipsa inference will in each case be a consequence of its strength which, in turn, depends upon the degree of probability of its truth together with the appropriate, stated policy considerations." *Zukowsky,* at 602, concluded that a so–called "res ipsa instruction" should not be given. The question of res ipsa was not briefed and the gratuitous comments of the majority may prove to be only an illusory assist to the plaintiff.

Another policy reason favoring strict liability is the ability of the offending activity to spread the financial risk through its enterprise or through liability insurance. Again, this is a judicially accepted rationale. Restatement (Second) of Torts § 402A, comment *c* (1965); *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969); *Peck,* 46 Wash. L. Rev. at 241.

Turning to the Restatement (Second) of Torts, the majority's result is exactly contrary to § 520A:

If physical harm to land or to persons or chattels on the ground is caused by the ascent, descent or flight of aircraft, or by the dropping or falling of an object from the aircraft,

(a) the operator of the aircraft is subject to liability for the harm, even though he has exercised the utmost care to prevent it, and

(b) the owner of the aircraft is subject to similar liability if he has authorized or permitted the operation.

Restatement (Second) of Torts § 520A (1976).

To justify its rejection of the clear rule of § 520A, the majority holds that § 520A can have validity *only if* aviation can be denominated an abnormally dangerous activity. Majority, at 584. The majority then analyzes the factors set forth in § 520 to conclude that this particular activity did not meet the criteria of § 520, therefore § 520A does not apply. It relies upon comment *a* to § 520A: "This Section is a special application of the rule stated in § 519, together with that stated in § 520."

This result ignores the very scheme of these interrelated sections. Section 519 declares the general principle of liability; § 520 lists the factors to be considered in determining whether an activity is abnormally dangerous. Section 520A declares a special rule to ground damage. What the majority overlooks is that the authors of the Restatement (Second) of Torts in 1977 expressly intended that § 520A stand on its own, *i.e.*, that it in fact was a special rule, quite distinct from § 520 requirements.

The majority, instead, rejects the very judgment and conclusion which led to the insertion of § 520A. This is proved by comment *a* to § 519 which states that it must be read together with various sections, *including § 520A*. This is highlighted by the comment to clause (c) under § 520 which clearly indicates that § 520A was a separate rule, quite apart from the factors of § 520, *i.e.*, § 520A was in fact a separate and distinct rule of liability. It states: "*As to strict liability for ground damage resulting from aviation,*

*see § 520A."* (Italics mine.) Restatement (Second) of Torts § 520, at 39 (1977).

It is crystal clear that § 520A was not intended to be dependent upon a separate analysis under § 520 as the majority holds.

When § 520A was introduced into the Restatement of Torts, the Advisers and the Council of The American Law Institute *all agreed* that there should be a *separate* section on ground damage from aircraft. The proposed section would have imposed no liability unless the harm was intentional or caused by negligence except for abnormally dangerous operation. Nine of the thirteen Advisers rejected the proposal, wishing to retain strict liability. Those Advisers included such luminaries as Fleming, Keeton, Seavey, Traynor and Wade. The Council accepted the new section as written. The Reporter, William L. Prosser, was not free from doubt. Restatement (Second) of Torts (Tent. Draft No. 10, 1964) and Reporter's Notes to Institute, at 69. Eventually the Institute disapproved the distinction between "normal" and "abnormal" flight and adopted the present strict liability contained in § 520A. Restatement (Second) of Torts, at 1 (Tent. Draft No. 12, 1966). It was published in volume 3 in 1977. Section 520A remains in existence today, but the majority does not adopt it, preferring to reach a result contrary to that of eminent scholars and practitioners who fought out the very battle which the majority now resurrects.

The majority attempts to buttress its result by an analysis of each factor listed in § 520, finding most to be lacking. Such analysis is irrelevant in light of the language in the comments and of the history of § 520A. Nonetheless I will review the majority's conclusions. First, it is not necessary that each of the factors in § 520 be present to meet the test. Comment *f* states that ordinarily several of the six elements will be required for strict liability, but that it is not necessary that each of them be present, especially if others weigh heavily.

The heart of § 520 is contained in this language: "The

essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care." Restatement (Second) of Torts § 520, comment *f*, at 37–38 (1977).

The first factor in § 520(a) is a high degree of risk of harm. The majority asserts that no such showing has been made, relying on statistics cited in several footnotes. Majority, at 587. This conclusion misses the point. The question is not whether it is statistically more safe to fly in an airplane than ride in a car, which is all the majority states. The question rather is whether there is a high degree of risk of some harm when an airplane lands on someone's house. Comment *g* makes it perfectly clear that if the potential harm is sufficiently great, the likelihood that it will take place may be comparatively slight and yet the activity be regarded as abnormally dangerous.

This comment is perfectly logical. The actor cannot hide behind relative statistics; if serious potential harm exists, that is enough. The harm need not occur in 51 percent of the activities. Any other interpretation, such as the majority's, would allow the defendant to escape by proving "while our dynamite leveled 3 square city blocks, it doesn't happen very often."

The majority acknowledges that the likelihood of great harm exists, factor (b). Majority, at 587. Factor (c) speaks of the inability to eliminate the risk by the exercise of reasonable care. The majority concludes that because of extensive governmental regulation and continuing technological improvements in aircraft manufacture, maintenance, and operation the overall risk of serious injury from ground damage can be "sufficiently reduced by the exercise of due care." Majority, at 587. Where the majority gets its technical information escapes me, although I know for certain that it is not from the record.

The comment makes clear that what is referred to is the unavoidable risk remaining even though the actor has taken

reasonable care. It is interesting to note that after asserting that due care "sufficiently" (whatever that means) reduces the risk of serious injuries, the majority immediately states that the causes of aircraft accidents are legion, and can come from a myriad of sources including lightning, wind shear and acts of God. Indeed the majority speculates that any listing of accident causes undoubtedly would fall short of the possibilities. Majority, at 588.

Thus the majority's reasoning is that regulation and technology prove that aircraft can be operated with minimal risk, but the causes of accidents, including acts of God, are so legion that the possibilities cannot be listed.

The majority manipulates its own statistics about aviation safety by including statistics for regularly scheduled commercial airlines. Majority, at 587. To the extent that it is relevant, it is significant to note that the accident rate for general aviation is more than 6½ times greater than for scheduled commercial airlines. National Transportation Safety Board, *Annual Report* app. A (1985). Further casting doubt upon the validity of the majority's conclusory statements that regulation and improved technology has "sufficiently reduced" the risk of harm are the *actual* statistics. The accident rate per 100,000 hours for general aviation in 1980 was 9.86 whereas in 1984 it had only reduced to 9.56. National Transportation Safety Board, *Annual Report* app. G (1985). In any event, such statistics are of little consolation to this losing plaintiff.

The majority in five lines concludes that factors (d), (e), and (f) do not favor imposition of strict liability. Factor (d) is the extent to which the activity is not a matter of common usage. The majority simply says it is a matter of common usage. Once again the majority ignores the expressed thrust of the Restatement. Comment *i* indicates that an activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community. The majority likewise ignores the reasoning of our holding in *Langan v. Valicopters, Inc.*, 88 Wn.2d 855, 864, 567 P.2d 218 (1977) where we recognized

that crop dusting is prevalent and done in large portions of the Yakima Valley, but was not of common usage when carried on by 287 aircraft. An analogy makes clear the faulty premise in the majority's reasoning. Elevators are in common usage and are used by many. That does not make the *operation* of elevators a matter of common usage.

While there are relatively significant numbers of private pilots, such flying is hardly customarily carried on by the great mass of mankind or by many people in the community. "Many people in the community" is necessarily a relative term. How many people in the community carry on the activity in relation to the size of the community? Using the very statistics cited by the majority (Comment, *Aviation Law: Owner–Lessor Liability—The Need for Uniformity,* 36 Me. L. Rev. 93 (1984)) the percentage of private pilots in the United States is .0003 percent of the population. When 3 people out of 10,000 are private pilots it is readily apparent that flying of private aircraft is not carried on by "many people in the community." To a certainty, private flying of a plane to test a noncertified fuel system is not of common usage, the majority's contrary bald assertion notwithstanding. I agree, as a general proposition, that flying over populated areas is not an inappropriate activity, factor (e). However, attempting to land in a populated area where there is no airport is not appropriate. The locale of the particular incident is what is important, *e.g.,* oil drilling in a residential area is not an appropriate activity. *Green v. General Petroleum Corp.,* 205 Cal. 328, 270 P. 952 (1928).

The last factor, (f), value to the community, is marginally relevant and does not outweigh those factors which favor strict liability.

The drafters of the Restatement (Second) of Torts rejected the very points relied upon by the majority. They recognized the great improvement in safety, but found that the risk of harm to anyone on the ground is obvious, that it cannot be said that danger of ground damage has been so eliminated or reduced that ordinary rules of negligence would apply, and that the gravity of the harm is still a fac-

tor even though there may be relatively few cases where it occurs. Further, there was the obvious fact that those on the ground are quite helpless to select any locality in which they will not be exposed to the risk, however minimized it may be. Finally they note that while thousands participate in aviation, those who actually carry on the activity itself are relatively few. Restatement (Second) of Torts, at 1 (Tent. Draft No. 12, 1966).

Thus, if this court feels bound to meet some of the factors set forth in § 520 before applying the clear principle of § 520A, it can do so by the above analysis.

In 1969 this court did not hesitate to adopt Restatement (Second) of Torts § 402A (1965) to impose strict liability upon product manufacturers. *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 532, 452 P.2d 729 (1969). In *Seattle–First Nat'l Bank v. Tabert*, 86 Wn.2d 145, 149, 542 P.2d 774 (1975) we extended application to others within the chain of distribution. We have held that pile driving and crop dusting necessitate application of strict liability. *Vern J. Oja & Assocs. v. Washington Park Towers, Inc.*, 89 Wn.2d 72, 569 P.2d 1141 (1977); *Langan v. Valicopters, Inc.*, 88 Wn.2d 855, 567 P.2d 218 (1977). We have forcefully recognized that policy may require the defendant to bear the cost of injury rather than the innocent plaintiff. *Martin v. Abbott Labs.*, 102 Wn.2d 581, 604, 689 P.2d 368 (1984).

Now in this case the majority casts aside the principles and rationale of these enlightened decisions and places upon the innocent plaintiff a burden of proof which as a practical matter closes the courthouse door to this plaintiff.

Comment *c* to Restatement (Second) of Torts § 402A sets forth the justification for strict product liability. The seller of the product, by marketing it, has assumed a special responsibility to any member of the consuming public who may be injured by it. Should not a pilot, especially on a test flight, have a similar responsibility to innocent persons on the ground? The public has a right to expect that sellers will stand behind their goods. Persons on the ground expect aircraft to not crash into their homes. Public policy

demands that the burden of accidental injuries caused by products be placed upon those who market them. Is it not equally logical that such burden be placed on persons who fly airplanes? The cost to sellers can be treated as a cost of production and insured against. Consumers are entitled to maximum protection at the hands of someone and the proper persons to afford it are those who market the products. Similarly, innocent persons on the ground are entitled to protection. Who better to provide it than the enterprise for whose purpose and benefit the danger was created.

I suggest that were it not for the historical development of the concept of abnormally dangerous activity, there would be no reason or justification for denying strict liability for aircraft damage to persons or property on the ground. The philosophy which led to strict product liability should be and is equally relevant to aircraft liability.

In summary, I would affirm the trial court which held that strict liability applies. The able trial judge saw the obvious policy reasons for strict liability which the majority rejects.[1]

Adoption of strict liability for ground damage from aircraft is justified on either of the two theories set forth, *i.e.*, (1) policy reasons and (2) the literal language of Restatement (Second) of Torts § 520A (1977). Under either theory liability would apply to the operator and to the owner of the aircraft if the owner authorized or permitted the operation. Section 520A(b).

---

[1]In his oral ruling, incorporated into his order, the trial judge said, in part: "Also, the Court believes it would be highly inequitable and unfair and against public policy to require an innocent third party in the situation outlined here to undergo a trial involving the owner of the plane, the pilot, the manufacturer and possibly distributor or maybe even the retail seller of the alleged defective part in order to recover property damage to his home, the reason being that in this particular case the Court will opine that the attorney's fees and costs involved to the innocent third party would greatly exceed the requested amount of recovery and obviously there would be no legal provision for the third party to recover his attorney's fees in such a situation." Verbatim Report of Proceedings, at 4.

I would affirm.

PEARSON, C.J., and DORE and GOODLOE, JJ., concur with BRACHTENBACH, J.